JOSEPH G. ENGLISH, Conservator,

*v.*

ANN N. PORTER.

*Filed at Springfield March 26, 1884.*

1. CONTRACT—*mental capacity.* Although the mind of a person may be to some extent impaired by age or disease, still, if he be capable of transacting his ordinary business,—if he understands the nature of the business in which he is engaged, and the effect of what he is doing, and can exercise his will with reference thereto,—his acts will be valid and binding.

2. EVIDENCE—*burden of proof—to avoid a deed on the ground of insanity or undue influence.* On bill by a conservator to set aside a conveyance of real estate made by his ward, on the ground of insanity of the grantor and undue influence of the grantee over him, the burden is upon the com-

plainant to prove one or both of these allegations of his bill by a preponderance of evidence.

3. SAME—*sufficiency—to show improper relations between a man and a woman.* The fact that a man is not the husband of a woman with whom he is on intimate terms and transacts business, but by some were supposed to be man and wife, is not sufficient evidence of illicit or adulterous intercourse between them, or of improper relations.

4. SAME—*the greater number of witnesses does not necessarily control.* Mere numbers of witnesses alone, testifying to a state of facts, or as to the mental capacity of another to make a rational contract, will not control, where the less number are more intelligent, more reliable, or in any material respect superior as witnesses to the others.

5. CONVEYANCE—*in payment of a debt—relations between the parties, as affecting the validity of the transaction.* A conveyance of land in payment of the notes of the grantor, for money owing to the grantee, will be sustained, and in such case it is immaterial in what relation the parties may have stood toward each other. It is only where a conveyance is purely voluntary, or at least for an inadequate consideration, that inquiry into that relationship can become material.

APPEAL from the Circuit Court of Vermilion county; the Hon. J. W. WILKIN, Judge, presiding.

Mr. J. C. BLACK, and Mr. E. R. E. KIMBROUGH, for the appellant:

In determining the question of capacity of R. L. Porter to convey his property on the 7th and 15th days of April, 1881, the court will look beyond the few facts of the actual signing, and consider all competent evidence as to the life and mental habits and condition of the alleged insane person. *Hopps* v. *People,* 37 Ill. 385; *Haviland* v. *Hayes,* 37 N. Y. 25; *Bitner* v. *Bitner,* 65 Pa. 347; *Robinson* v. *Adams,* 62 Maine, 369.

If insanity be once established, its continuation is presumed. *Menkins* v. *Lightner,* 18 Ill. 282; *Rust* v. *Megee,* 36 Ind. 69; *Cadwell* v. *King,* 4 Cow. 207; *Haviland* v. *Hayes,* 37 N. Y. 25.

The court will, on the question of insanity, consider not only proof of former insanity, but also proof of subsequent insanity. If Porter was insane before and after signing the

deeds, the defendant must show, by a preponderance of evidence, that he was sane at the time of executing the deeds. *Dumond* v. *Kiff*, 7 Lans. 465; *Emery* v. *Hoyt*, 46 Ill. 258; *Haviland* v. *Hayes*, 37 N. Y. 25.

The influence of a woman who sustains illicit relations to a man, of the character and duration shown in this case, is an undue influence. *Kessenger* v. *Kessenger*, 37 Ind. 341; 1 Redfield on Wills, 520; *Mountain* v. *Bennett*, 1 Cox, 355; *Dean* v. *Negley*, 41 Pa. St. 312.

When the sexual relations of a man and woman are for a time openly adulterous, no presumption will be indulged of marriage from long cohabitation. To interrupt the adulterous relation and make it pure, there must be proof of marriage. *Port* v. *Port*, 70 Ill. 473; *McDeed* v. *McDeed*, 67 id. 546.

Mr. F. BOOKWALTER, and Messrs. MANN, CALHOUN & FRAZIER, for the appellee :

As to the degree of mental weakness or of mental capacity to avoid or sustain a contract, see *Pickerell* v. *Morss*, 97 Ill. 220; *Brown et al.* v. *Riggin et al.* 94 id. 560; *Carpenter* v. *Calvert*, 83 id. 62; *Rutherford* v. *Morris*, 77 id. 397; *Meeker et al.* v. *Meeker*, 75 id. 266; *Lilly* v. *Waggoner*, 27 id. 395; *Titcomb* v. *Vantyle*, 84 id. 371; *Willemin* v. *Dunn et al.* 93 id. 511; *Wiley* v. *Ewalt*, 66 id. 26; *Lindsey* v. *Lindsey*, 50 id. 79; *McCarty* v. *Kearnan*, 86 id. 291; *Trish* v. *Newell*, 62 id. 196; *Miller* v. *Craig*, 36 id. 109.

On a bill filed by a conservator to set aside a conveyance, the burden is on him to establish his bill. *Pickerell* v. *Morss*, 97 Ill. 220.

Mr. JUSTICE SCHOLFIELD delivered the opinion of the Court :

This was a bill in equity, by Joseph G. English, as conservator of Robert L. Porter, to set aside certain conveyances of real estate to Ann N. Porter, on the grounds of the insanity

of the grantor and the undue influence of the grantee over him. The circuit court decreed that the bill be dismissed, and the question to be determined on this appeal is, whether that decree is sustained by the evidence.

The burden was upon the complainant to prove one or both of these allegations of his bill by a preponderance of evidence. (Lilly v. Waggoner, 27 Ill. 395; Willemin v. Dunn et al. 93 id. 511.) We are not satisfied that this has been done. Appellant proved that the conveyances were executed on the 7th and 15th of April, 1881; that on the 12th of May, 1881, Porter was duly adjudged insane, and appellant was appointed his conservator, in a proper proceeding for that purpose in the county court of Vermilion county; and several witnesses testified, on his behalf, that in their opinion Porter was, by reason of his insanity, incapable of transacting business at the date of the execution of the conveyances. More numerous witnesses, however, on the other hand, and apparently equally entitled to credit, testified, that in their opinion he was at that time capable of transacting business.

We think the fair conclusion, from the evidence, is, Porter's mind was affected by a form of dementia, slightly, for several months (perhaps longer) before the execution of the conveyances. This gradually increased, and some time after the appointment of the conservator it became such that he was incapable of self-control and the transaction of business. It may be, too, that the rate of mental impairment was accelerated towards the last; but Porter had a considerable amount of business, somewhat varied in character, of which he had the charge and direction until some time after the appointment of the conservator, and this he managed and directed with care and diligence, and at the dates of the execution of the deeds his mind was sufficiently strong and self-poised to enable him to comprehend all the details of what he was doing, and the effect of his acts, and to exercise his own volition with reference thereto. Drs. Lemon, Barton and More-

house fix the period of their first observation of a marked decline in the mental powers of Porter, in the month of October, 1880, during the illness of one Peter Walsh, a foster-son of Porter, to whom he was warmly attached. Walsh died on the 9th of November following, and thereafter, in their opinion, Porter declined in mental power pretty rapidly. They noticed it, chiefly, as manifested by his grief for the death of Walsh, in incoherence in speech, and in apparent difficulty in continuity of thought upon any given subject. They give no instance of inability to rationally manage and dispose of property, and they show that he had the charge of his business,—which, as already observed, was pretty extensive, and which included a medical practice,—until after the appointment of the conservator. It is true, towards the last the practice of medicine is not shown to have been extensive, but it is shown to have been carried on until the appointment of the conservator, and one apparently very intelligent witness, Dr. Woodbury, testifies that he regarded him capable of properly handling so dangerous a drug as morphine, even after the appointment of the conservator. Porter was the owner of a farm of eight hundred acres, and of other real estate, and some personal property, all of which, it is shown, he managed intelligently and carefully, even after the appointment of the conservator.

There were four witnesses present when the deeds were executed,—Norvell, (the scrivener,) Forbes, Alles and Terry. They were all intimately acquainted with Porter, and had long known him, and they unite in the opinion that he was then competent to transact business. Norvell says, about a week before the deeds were made Porter came to his office alone, and told witness he wanted him to prepare some deeds from him (Porter) to Mrs. Porter, as he had used some of her money; that Porter had spoken about this several times before; that at the time of making the deeds Porter again came alone to him, and indicated on the plat what lands he

wished to convey to appellee; that his capacity for transacting business was good, and he appeared to the witness as rational as he ever had since he had first known him, in 1867. He further says that Porter assented to the indorsement of the price of the lands as a credit upon the notes which appellee held against him.

Judge E. S. Terry says, that he had known Porter for twenty-five years, and that he was present when the deeds were made; that at that time Porter took him aside and told him that he had been receiving from his wife divers sums of money, and that he was then conveying to her real estate, and showed the witness the lands on the plat. Judge Terry further says that he had discovered some impairment of Dr. Porter's mental powers previous to that time, but that such impairment was not, in his opinion, of such a character as to render him incompetent to do a valid act, either as to the disposition of his property, or otherwise. He says that Porter asked him if he did not think he was doing right in making the conveyances, and that he exhibited the map and explained to witness intelligently what he was conveying, and the purpose of the conveyance.

The conservator, Mr. English, testified that he purchased land of Porter two or three months before the appointment of himself as conservator; that he then discovered nothing wrong, and that Porter conducted himself in the transaction, in the way of looking after his own interests, just as any man would. He then uses this language: "We went down and looked at the land, and talked the matter over. He fixed his price, and I took it, and paid him the same price I had paid others in the same neighborhood." And he thus describes the condition of Porter's affairs, and his conduct after he was appointed conservator: "I found his affairs in good condition after my appointment. He rendered me a great deal of assistance, (i. e., in getting the run of his business, and the situation, location and condition of his property.) He went

out to the farm with me, and looked all over, minutely, every-thing; gave me to understand the run of his business at his farm, even down to the smallest piece of machinery. * * * He knew the boundaries and extent of his land perfectly. * · * * He went out to the farm every week or ten days, after my appointment, and looked after things there. I trusted him to do it. I didn't see there was anything wrong, for a time, with him." He further says: "It must have been five or six months before he began to show particular trouble."

In addition to the four witnesses present when the deeds were made, twelve others, excluding the defendant, testify to an acquaintance with Porter for varying periods, and to some degree of business association, and all express the opinion that he was competent to transact business when the con-veyances were executed, whereas on the other side but nine witnesses, including the son, the daughter-in-law and the daughter of Porter, testify to his incompetency. Mere num-bers, alone, it is true, are not to control where the less num-ber are more intelligent, more reliable, or in any material respect superior, as witnesses, to the others; but we are unable to say this of the witnesses in behalf of appellant. While they are presumed to be respectable, and nothing is proved rebutting that presumption, precisely the same is to be said of the witnesses on the other side, and appellant's witnesses have no material advantage in intelligence in re-spect to the subject matter of their evidence. If the only question were, does the evidence show that Porter's mind was affected by dementia at the date of the deeds, the answer should, doubtless, be in the affirmative. But that is not the question here. Although the mind of an individual may be, to some extent, impaired by age or disease, still, if he be capable of transacting his ordinary business,—if he under-stand the nature of the business in which he is engaged, and the effect of what he is doing, and can exercise his will with

reference thereto,—his acts will be valid. *Meeker* v. *Meeker,* 75 Ill. 266; *Trish* v. *Newell,* 62 id. 196; *Pickerell* v. *Morss,* 97 id. 220; *Lindsey* v. *Lindsey,* 50 id. 79.

There is no direct proof of undue influence by appellee over Porter, and the only indirect proof to that effect is the testimony of the son, daughter-in-law and daughter, that appellee admitted that she had persuaded Porter to make her a deed, or deeds, and that he had previously paid her all that he owed her, from the proceeds of a sale of cattle. This is denied by appellee in her evidence, and she produced in evidence, on the hearing, uncanceled notes of Porter to her, bearing different dates, long before his sanity is questioned, and amounting, in the aggregate, to some $9000, exclusive of interest. She proves that she had been, for some years, a medical practitioner, having a large practice, and Norvell, Terry, Forbes and Woodbury each testify that Porter admitted to them that he was indebted to appellee for money of her's which he had used, and the first three of these witnesses testify that Porter said, in effect, the conveyances to appellee were in payment on this indebtedness,—and, as we have before seen, the evidence shows that at that time he was competent to transact such business. It can hardly be said, then, it is proved, by a preponderance of evidence, these conveyances were merely voluntary. If they were—as Norvell, Forbes and Terry testify that Porter said they were—in payment of these notes, it is immaterial what relations appellee and Porter may have sustained towards each other. It is only in the event the conveyances were purely voluntary, or at least for an inadequate consideration, that inquiry into that relationship could become material.

We may remark, however, that if the inquiry as to the relations between appellee and Porter was pertinent, this record does not afford sufficient evidence that they were illicit. Dr. Porterfield says he is a son of Porter, whose real name is Porterfield, and he thereafter uses this language: "Father

said, that on coming to Danville with Mrs. Porter he had dropped the 'field' from his name." The witness does not say their relations on coming to Danville, or after they came there, were illicit. He says he has known "Ann N. Miller," *alias* Ann N. Porter, over ten years, and that he has no knowledge of relationship with Ann N. Porter. In another place he speaks of a visit by his father to his mother, in 1859, and in answer to the question, "What members of your father's family are living?" he mentions no wife. Mrs. Armstrong testifies that she is a daughter of Porter, but is not in any manner related to appellee, that she knows of, and in giving the names of her father's family she mentions no wife. Now, surely, in all this there is no proof of illicit intercourse. They both, however, call her, in repeating her name, in other portions of their depositions, "Mrs. Porter," and Judge Terry and Dr. Woodbury call her the wife of Porter. But if it be true that they are mistaken, there is no proof of adulterous intercourse. The bill makes no such charge,—it does not characterize their relations. It can not, in any view, be accepted as sufficient proof of illicit relations that two people of opposite sex do business together, or are, mistakenly, called husband and wife. The mistake in thus styling them, might, it is true, result from illicit relations, but it might, also, result from other causes, and the proof, therefore, should show what in fact their relations were.

The decree below must be affirmed.

*Decree affirmed.*