## CHARITY FRANCIS *et al.*

### *v.*

## SYLVESTER WILKINSON *et al.*

*Filed at Ottawa October 26, 1893.*

1. GIFT—*parent taking deed in child's name.* Ordinarily, where a purchase of real property is made by a father in the name of his legitimate child, no trust will result in favor of the father, but the transaction will be presumed to be a gift for the benefit of the child.

2. ADVANCEMENT—*adequacy of consideration.* Where a father disposes of property by way of advancement or distribution to his children during his life, instead of disposing of it by will, courts will not be as rigid in considering the adequacy of the consideration paid as if the transaction was with strangers. If a father makes two of his sons the recipients of his bounty, the other children will have no legal ground of complaint.

3. MENTAL CAPACITY—*required to make a deed or will.* A man has sufficient mental capacity to dispose of his property by will or deed if he is capable of transacting ordinary business, and acting rationally in the ordinary affairs of life. Buying and selling property, settling accounts, collecting and paying out money, or borrowing or loaning money, are mentioned as instances of what is meant by the transaction of the ordinary affairs of business.

4. A grantor, at the time of making a deed, must know and comprehend the transaction in which he is engaged,—or, in other words, the mental capacity to be considered is that which exists at the time of the execution of the deed.

5. SAME—*effect of old age and loss of memory.* Old age and loss of memory do not necessarily and of themselves indicate a want of capacity to make a conveyance. A deed will stand notwithstanding the fact that the intellectual powers of the grantor have been somewhat impaired by age, if it appear that he retains a full comprehension of the meaning, design and effect of his acts.

6. SAME—*burden of proof.* The burden is upon a complainant who seeks to set aside an executed deed for want of mental capacity, or for the exercise of undue influence, to prove the allegations of his bill by a preponderance of the evidence.

7. UNDUE INFLUENCE—*character of, to invalidate deed.* Undue influence which will justify the setting aside of an executed deed must have been of such a nature as to deprive the grantor of his free agency,

and thus to render his act more the offspring of the will of another than of his own will.

8. SAME—*between parent and child.* Where the natural position of parent and child is so changed that the former becomes subject to the dominion of the latter, and when their situation is such that the child has a controlling influence over the will and conduct and interests of the parent, equity will interpose its jurisdiction to set aside instruments executed between them; and under such circumstances, gifts from parents to children will be set aside, unless most satisfactory evidence is produced that they were not obtained by undue influence.

9. SAME—*not inferred from relation of parent and child.* Undue influence will not be inferred from the relation of parent and child, where the gift is from the parent to the child, unless the former, at the time of the gift, was under the control and dominion of the latter.

10. The fraud or undue influence which will render a will or a deed invalid must be connected with the execution of the instrument, and operating when it is made. Although a father may act under the advice of his son in his ordinary affairs, and may be influenced by that advice, yet such relation and influence do not tend to prove the exercise of undue influence in the execution of a conveyance by the former to the latter.

11. SAME—*influence from affection.* Influence secured through affection is not wrongful, and, therefore, although a deed is made by a father to a child at his solicitation and because of partiality induced by affection for him, it will not be undue influence if it is not such as to deprive the grantor of his free agency.

12. SAME—*inequality in distributing parent's estate.* Inequality in the distribution of property by a parent among his children is not of itself conclusive evidence of undue influence, although it may be considered as a circumstance tending to establish undue influence. A grantor or testator may give one child more than another without invalidating the conveyance or will.

13. SAME—*evidence of—declarations of grantor.* It is well settled that the declarations of a grantor when the grantee is not present can not be admitted in evidence for the purpose of invalidating the deed. Parties making deeds or wills can not invalidate them by their own parol declarations made previously or subsequently.

14. The fact that a grantor, many years before making a final disposition of his property, expressed an intention to divide it equally among his children, affords no evidence of undue influence or mental incapacity when a different disposition of his property is made.

15. VOLUNTARY CONVEYANCE—*good inter partes.* The general rule is, that voluntary conveyances, although void as to creditors, are valid as to the parties, and can not be set aside by the grantor or his heirs.

APPEAL from the Circuit Court of Stark county; the Hon. T. M. SHAW, Judge, presiding.

This is a bill filed on the 2d day of September, A. D. 1886, by ,Charity Francis of Kansas, Rachel Curfman of Kansas and Nancy Cox of Stark County, Illinois, daughters of Solomon Wilkinson, deceased, formerly of Stark County, Illinois, against Sylvester Wilkinson, Alonzo Wilkinson and Newton Wilkinson of said county of Stark, sons of said Solomon Wilkinson, deceased, and Frances Leffler of said county, also a daughter of said Solomon, and John Leffler, of said county, a son of said Frances Leffler and grandson of said Solomon, to set aside certain deeds executed to the defendants by the said Solomon in his life-time, and for partition of the lands. described in said deeds among the said children of the said Solomon.   Answers were filed, by said defendants denying the material allegations of the bill.   Since the beginning of the suit Rachel Curfman, Frances Leffler and John Leffler have died and their representatives have been made parties.   After hearing had upon testimony oral and documentary and upon evidence submitted in the form of depositions, the Circuit Court dismissed the bill for want of equity, and the present appeal is prosecuted from said decree of dismissal.

Solomon Wilkinson came from Ohio to Stark County, Illinois, in 1849, being at that time about 50 years old.   He brought some money with him, and at once purchased a farm of 200 acres, on which he lived until his death.   He died on April 2, 1885, leaving seven children, the four daughters and three sons above named, towit: Rachel, Charity, Nancy, Frances, Sylvester, Alonzo and Newton.   His wife died in the spring of 1871.   The oldest daughter, Frances, married in 1850, but her husband died in about six weeks leaving her one child, John Leffler.   She never left her father, but kept house for him and managed the household affairs after her mother's death; and she and her son, John, who became of

age in 1872, lived with the old man on the home place until his death. Charity married in 1853, Rachel in 1856, and Nancy in 1857 or 1858, each leaving home at the date of her marriage. It is in evidence, that the last three daughters assisted in the work of the farm up to the dates of their respective marriages. Sylvester became of age in 1863, Alonzo in 1865 and Newton in 1868. The three sons remained on the home farm, Alonzo until his marriage in 1875, Sylvester until his marriage in 1876, and Newton until his marriage in 1881. Up to the latter date, and longer, they and John Leffler "worked" the home farm and adjoining farms purchased by their father. The deeds sought to be set aside are the following: a deed of 160 acres, executed on January 5, 1869, by Robert B. McChance to Sylvester Wilkinson; a deed of 80 acres, executed on February 16, 1870, by James A. McChance and his wife to Alonzo Wilkinson; four deeds executed by Solomon Wilkinson, all dated May 27, 1873, one of 133 acres to Sylvester Wilkinson, one of 187 acres to Newton Wilkinson, one of 111 acres to John Leffler, and one of 169 acres to Frances Leffler; a deed, dated May 27, 1873, executed by said Sylvester to said Alonzo conveying one half of the 160 acres conveyed to Sylvester by Robert B. McChance; a deed of 160 acres, dated October 21, 1874, executed by Davis Lowman and wife, and Daniel Burge and wife, to said Sylvester, Alonzo, Newton and John. The first two deeds were recorded on the respective dates of their execution. The five deeds executed on May 27, 1873, were recorded on July 28, 1876. By the above deeds there were conveyed to Sylvester 253 acres, to Alonzo 200 acres, to Newton 227 acres, to John Leffler 151 acres, to Frances Leffler 169 acres, making 1000 acres in all. The evidence shows that the sons participated in the profits and produce realized from the business of the farms and received their respective shares of such business up to 1873 or perhaps 1881.

Mr. MILES A. FULLER, and Mr. FRANK A. KERNS, for the appellants:

Anything in the character of a will which renders it contrary to natural affection, as, where children or others entitled to the estate are wholly deprived of a share, or it is given in such unequal proportions as to indicate that it is wholly dependent upon caprice, over-persuasion or deception, must always excite apprehensions of undue influence, at the very least. 1 Redfield on Wills, (3d ed.) p. 521, sec. 24.

This is true even though the recipients of the bounty of the testator may have had no immediate connection with the execution of the will. *Harvey* v. *Sellens,* 46 Mo. 147; *Burt* v. *Quisenberry,* 132 Ill. 399.

As to evidence of declarations of a testator or grantor made after the execution of his deed or will, see *Reynolds* v. *Adams,* 90 Ill. 134.

As to undue influence in procuring the execution of the deed, see *Harper* v. *Harper,* 85 Ky. 160; *Jaycox* v. *Jaycox,* 40 Mich. 473; *Wheelen* v. *Wheelen,* 3 Cow. 587; *Brice* v. *Brice,* 5 Barb. 549; *Rowe* v. *Rowe,* 42 Mich. 195; *Thorn* v. *Thorn,* 51 id. 167; *Davis* v. *Dean,* 66 Wis. 100; *Harvey* v. *Sellens,* 46 Mo. 147.

Mr. C. C. WILSON, and Mr. FRANK THOMAS, for the appellees:

That a grantor is of advanced age, feeble health and impaired memory is not sufficient to render his deed void, when the evidence shows that when he executed it he fully comprehended what he was doing, etc. *Burt* v. *Quisenberry,* 132 Ill. 385; *Miller* v. *Craig,* 36 id. 109; *Myatt* v. *Walker,* 44 id. 485; *Lindsey* v. *Lindsey,* 50 id. 79; *Baldwin* v. *Dunton,* 40 id. 188; *Stone* v. *Wilbern,* 83 id. 105.

In an action to set aside a deed for undue influence and mental incapacity, where it is contended that the grantor's alleged incapacity was the result of *senile dementia,* it is error to refuse to charge that if the grantor had mind and memory

enough to recollect the property he was about to convey, the persons to whom and manner in which it was to be conveyed, etc., then the grantor was not incapacitated to make a deed. *Guild* v. *Hull,* 127 Ill. 523.

A contract will not be set aside on the ground of mental incapacity when the evidence merely shows that the party was laboring under intense excitement and depression of spirits, and that he understood the effects of what he was doing. *Perry* v. *Pearson,* 135 Ill. 218.

The contract or deed will be permitted to stand, notwithstanding the fact that the intellectual powers have been somewhat impaired by age or disease, if it appears that the grantor retains a full comprehension of the meaning, design and effect of his acts. The question in such case is whether or not the party alleged to be affected with mental weakness is capable of transacting ordinary business, or acting rationally in the ordinary affairs of life. *Perry* v. *Pearson,* 135 Ill. 218; *Meeker* v. *Meeker,* 75 id. 260; *McCarty* v. *Kearnan,* 86 id. 291; *Pickerell* v. *Morss,* 97 id. 220; *English* v. *Porter,* 104 id. 285; *Stone* v. *Wilbern,* 83 id. 105.

The declarations of a grantor not in the presence of the grantee are not admissible to invalidate his deed. *Guild* v. *Hull,* 127 Ill. 523; *Bentley* v. *O'Bryan,* 111 id. 53. *Bennett* v. *Stout,* 98 id. 47.

Undue influence, in law, implies something wrongful. It is not unlawful to use honest advice or persuasion to induce the grantor to make a deed. *Yoe* v. *McCord,* 74 Ill. 33.

Fraud or undue influence, to avoid a will or deed, must be directly connected with the execution. The influence exercised to avoid the instrument must be of such a nature as to deprive the maker of free agency, and render his act obviously more the offspring of the will of others than of his own. *Allmon* v. *Pigg,* 82 Ill. 149.

No amount of interference or undue influence exercised over the person in relation to other matters disconnected with

the making or execution of the deed will avoid the same. *Dickie* v. *Carter*, 42 Ill. 379; *Roe* v. *Taylor*, 45 id. 491; *Rutherford* v. *Morris*, 77 id. 413; *Yoe* v. *McCord*, 74 id. 44; *Stone* v. *Wilbern*, 83 id. 109; *Chandler* v. *Ferris*, 1 Huntington, 454.

Neither advice nor argument nor persuasion will vitiate a will made freely and from conviction, though such will might not have been made but for such advice and persuasion. 1 Redfield on Wills, 524; *Yoe* v. *McCord, supra.*

The justice or injustice of the disposition of property is immaterial to the question as to the validity of the deed. Within the rules of the law the grantor's control of property is absolute. *Meeker* v. *Meeker*, 75 Ill. 260; *Rutherford* v. *Morris*, 77 id. 413; *Burt* v. *Quisenberry*, 132 id. 385; *Campbell* v. *Campbell*, 130 id. 470.

Mr. JUSTICE MAGRUDER delivered the opinion of the Court:

The grounds, upon which the bill seeks to set aside the deeds, are, first, want of mental capacity, second, the exercise of undue influence. The three daughters of Solomon Wilkinson, who filed the bill, do not claim, that he showed any want of mental capacity until after the death of his wife in the spring of 1871. He was not able to read or write, but there is no testimony on either side, that he was not a vigorous man, both mentally and physically, prior to 1871. Hence, the deed of 160 acres executed in January, 1869, to his son, Sylvester Wilkinson, by Robert B. McChance, and the deed executed in February, 1870, to his son, Alonzo Wilkinson, by James A. McChance, cannot be invalidated because of any want of mental capacity. Nor are we able to discover that the execution of those deeds was procured by any kind of fraud, deceit or undue influence. The two tracts were purchased by Solomon Wilkinson, but the proof shows that he knew of and consented to the conveyances of them to his sons, Sylvester and Alonzo, who had remained with him after reaching the age of majority, and had assisted him, the one for six

and the other for five years, in his business of farming and stock-raising. Ordinarily, where a purchase of real property is made by a father in the name of his legitimate child, no trust results in favor of the father, but the transaction is presumed to be a gift for the benefit of the child. (2 Pom. Eq. Jur. sec. 1039). Undue influence will not be inferred from the relation of parent and child where the gift is from the parent to the child, unless the former, at the time of the gift, is under the control and dominion of the latter. (*Oliphant* v. *Liversidge*, 142 Ill. 160 ; *Burt* v. *Quisenberry*, 132 id. 399). J. H. Cox, the husband of one of the complainants, says that the deceased directed the deed of the 160 acres to be made in 1869 to Sylvester, because he had then concluded to give each of his children 160 acres of land. If such was his intention at that time, he did not subsequently carry it out as to the complainants. The fact, that a grantor, many years before making a final distribution of his property by the execution of deeds, expressed an intention to divide it equally among his children, affords no evidence of undue influence, or mental incapacity, where a different disposition of his property is made. (*Rutherford* v. *Morris*, 77 Ill. 397). The labor of the sons for their father during a number of years constituted some consideration for the conveyances, which were made to them by his vendors at his direction. Where a father disposes of property by way of advancement or distribution to his children during his life, instead of disposing of it by will, courts will not be as rigid in considering the adequacy of the consideration paid, as if the transaction was with strangers. (*Clearwater* v. *Kimler*, 43 Ill. 272). The deceased had the legal right to dispose of the two tracts in question as he pleased, and if he saw proper to make his two sons the recipients of his bounty, the other children have no cause of complaint. (Idem).

But the main contention between the parties is as to the deeds executed by the deceased on May 27, 1873, thereby

dividing 600 acres among his sons, his grandson, and his daughter, Mrs. Leffler. It is first insisted, that these deeds were invalid for an alleged want of mental capacity in Solomon Wilkinson to make them. We have frequently decided, that a man has sufficient mental capacity to dispose of his property by will or deed, if he is capable of transacting ordinary business, and of acting rationally in the ordinary affairs of life. Buying and selling property, settling accounts, collecting and paying out money, or borrowing or loaning money, have been mentioned as instances of what is meant by the transaction of the ordinary affairs of business. (*Meeker* v. *Meeker*, 75 Ill. 260; *Brown* v. *Riggin*, 94 id. 560; *Schneider* v. *Manning*, 121 id. 376; *Freeman* v. *Easly*, 117 id. 317; *Perry* v. *Pearson*, 135 id. 218). The burden is upon the complainant, who seeks to set aside an executed deed for want of mental capacity, or for the exercise of undue influence, to prove the allegations of his bill by a preponderance of the evidence. (*English* v. *Porter*, 109 Ill. 285). We do not think, that there is, in this case, a preponderance of the evidence in favor of a want of mental capacity. In 1873 Solomon Wilkinson was about 72 or 73 years old. Witnesses for complainants swear, that, after the death of his wife in the spring of 1871, he showed signs of feebleness, was much affected by the loss of his wife, was not as clear and active in his mind as he had been, was complaining and despondent, would sometimes shed tears in talking of his wife, showed the infirmities of age, complained of not being able to attend to his business as he had done, etc. Some of these witnesses give it as their opinion, based upon their conversations with him, that he was not competent to do business in 1873. On the contrary, an equal number of witnesses testifying for the defendants say, that they saw no particular change in him after 1871, except such as was incident to advancing age; that they saw no difference in his business capacity; that he seemed to know as much as he ever did; that, although he fretted about his wife,

"his mind was all right;" that "he was a very smart old man."
One of the physicians, who attended upon him for eight or
ten years before his death and in his last sickness, says, that
he would sit by his fireside and talk with him about the com-
mon topics of the day, and that he noticed no failing except
what old age would account for. Another doctor, who was
called in as consulting physician during his last illness and
had known him and his wife for thirty years, says that he was
low-spirited after her death, but with that exception he noticed
no difference in his mind. All the witnesses on both sides
agree, that he was a strong man physically, and before 1871
was an unusually competent man as a farmer and stock-dealer.
Particular instances are mentioned where he transacted busi-
ness after 1873: in 1876, or 1877, he went to Peoria, 25
miles from his home, and paid a judgment of about $1800.00
which had been obtained against himself and his son-in-law,
Cox, upon a note signed by him as security for Cox; and the
owner of the judgment states that, at that time, his mental
condition was good, "his mind was as strong and reasonable
as anybody's," and "he was capable of attending to any other
business;" in 1884, the year before his death, at the age of 83
or 84, he went to the office of a lumber merchant in Wyom-
ing, distant about two miles and a half from his home, and
directed an answer to be written to a letter about a pension
claim, which he had received from the Commissioner of Pen-
sions, dictating the replies to be made to the questions in the
letter, listening to each answer when it was read to him, and
approving of it as being what he wanted; in 1878 he sold a
horse, making the trade himself, and the party buying the
horse from him says that "his mind was all right," and that
he was giving directions about the work on the farm; a mer-
chant in Wyoming swears that he sold him hardware in 1876
and 1878 to be used on the farm, and that his mind was
sound, and he was able to transact ordinary business; another
merchant swears, that the old man did business with him at

his store from 1873 to 1881, and paid the accounts from 1873 to 1876, and understood the nature of the business he was transacting, and that there was no impairment of his mind.

The grantor at the time of making the deed must know and comprehend the transaction in which he is engaged; or, in other words, the mental capacity to be considered is that which exists at the time of the execution of the deed. (1 Redfield on Wills, page 124; *Campbell* v. *Campbell*, 130 Ill. 466). The notary, who wrote the deeds made on May 27, 1873, and before whom they were acknowledged, swears, that Solomon Wilkinson came to his office in Wyoming on that day in pursuance of a previous appointment; that he had his title papers with him, arranged and classified so as to enable him to know what piece of land he wanted to convey to each grantee; that there was no one present while he was writing the deeds, although his son, Sylvester, may have come into the office with him; that the old man seemed to understand just what he wanted; that he said he was going to divide a portion of his property; that he would hand over one package of title deeds, and then another, and direct how the property described in each should be conveyed; that the conveyances written on that day were read over to him after they were drawn up, and were signed by him by his mark; that he was not especially feeble, except so far as there was feebleness incident to declining years; that his hands were tremulous, and tears came into his eyes, and he said he had reached that age when he did not feel able or competent to attend to his business; that he said he intended to provide for his other children in some other manner.

While the evidence shows, that, on May 27, 1873, the deceased was somewhat infirm by reason of old age, and that he was conscious of not possessing as much vigor as would enable him to manage his large farms, and attend to the raising of stock thereon, with the efficiency of former years; yet we think that he was mentally capable of executing the deeds

signed by him, and of making the division of property con-summated by him, on that day. Old age and loss of memory do not, necessarily and of themselves, indicate a want of ca-pacity to make a conveyance. (*Burt* v. *Quisenberry*, 132 Ill. 399; *Pooler* v. *Cristman*, 145 id. 405). There was, here, no such mental weakness as will justify a court of equity in setting aside the deeds, inasmuch as the grantor was not thereby rendered incapable of understanding and protecting his own interests. A deed will be permitted to stand, notwith-standing the fact that the intellectual powers have been some-what impaired by age, if it appear that the grantor retains a full comprehension of the meaning, design and effect of his acts. (*Perry* v. *Pearson, supra*).

It is next insisted, that these deeds were obtained by the undue influence of the grantees therein over Solomon Wil-kinson, and that for that reason they ought to be set aside. Undue influence, which will justify the setting aside of an exe-cuted deed, must have been of such a nature as to deprive the grantor of his free agency, and thus to render his act more the offspring of the will of another than of his own will. (*Rutherford* v. *Morris*, 77 Ill. 397; *Burt* v. *Quisenberry, supra*). Some of the witnesses for the complainants testify that, after the death of his wife in 1871, Solomon Wilkinson left the management of his business more to his sons than he had formerly done, while witnesses for the defendant say that he seemed to exercise no less control after that date than before.

The sons themselves swear, that each of them was given an interest in the proceeds and earnings of the farm after he be-came of age, on condition of his remaining at home and assist-ing his father. But even if it be true that the father gave his sons greater control over his business affairs after 1871 than they had previously had, that fact alone does not establish such a dependence upon them, that he could not freely exer-cise his own will in reference to the disposition of his property. There was money in the bank, which he had a right to draw

when he pleased. He came and went as he saw fit. (*Burt* v. *Quisenberry, supra*). Where the natural position of parent and child is so changed, that the former becomes subject to the dominion of the latter, and where their situation is such, that the child has a controlling influence over the will and conduct and interests of the parent, equity will interpose its jurisdiction to set aside instruments executed between them, and, under such circumstances, gifts from parents to children will be set aside unless most satisfactory evidence is produced that they were not obtained by undue influence. (*Burt* v. *Quisenberry, supra; Harvey* v. *Sellens,* 46 Mo. 147; *Brice* v. *Brice,* 5 Barb. 533). But the fraud, or undue influence, which will render a will or deed invalid, must be connected with the execution of the instrument and operating when it is made; (*Pooler* v. *Cristman, supra; Guild* v. *Hull,* 127 Ill. 523;) and, although a father may act under the advice of his son in his ordinary affairs and may be influenced by that advice, yet such relation and influence do not tend to prove the exercise of undue influence in the execution of a conveyance by the former to the latter. (*Brownfield* v. *Brownfield,* 43 Ill. 148; *Rutherford* v. *Morris, supra*). We discover nothing in the testimony in this case to indicate, that the deceased was under any such control, as that he was not able at all times to act freely and according to his own judgment. The circumstances already detailed in regard to the transaction of May 27, 1873, show, that the execution of the deeds, made by the deceased on that day, was his own act, and not the offspring of another's will. He made no conveyance to Alonzo, but, in addition to the 80 acres conveyed to the latter in 1870, his brother, Sylvester, deeded to him 80 of the 160 acres, which he obtained the title to in 1869. The notary testifies, that Sylvester thus conveyed the 80 acres to his brother, Alonzo, at the request of their father, and that such conveyance was referred to by the father as a part of his arrangement for the division of his property. The same considerations already

presented apply to the deed made by Lowman and Burge to the sons and grandson in 1874. Burge swears, that he made the deed to the sons and grandson while they and Solomon were present; that Solomon gave his notes for a part of the purchase money, and that his mind was perfectly sound. This conveyance was a consummation of the division made in 1873, and, while it does not appear when the notes were paid, yet the evidence shows, that the land was paid for out of the proceeds of the farm, as earned by the labors of the grantees in the deeds.

The father may have been influenced by affection for the three sons and grandson, who remained with him and aided him in managing his farms, and for the widowed daughter, who staid at his home, and kept house for him, and managed his household affairs. "But influence secured through affection is not wrongful, and, therefore, although a deed be made to a child at his solicitation, and because of partiality induced by affection for him, it will not be undue influence," if it is not such as to deprive the grantor of his free agency. (*Burt* v. *Quisenberry, supra*).

The testimony shows, that the complainants and their husbands received from their father from time to time about $2000.00 apiece, paid in land and money and in the discharge of security debts. They had married many years before their father's death, and had left home, and reared families, and acquired property of their own. The husband of one of the complainants was a witness to the execution of the deeds made on May 27, 1873. They knew of those deeds soon after their execution, and two of them received money from their father a short time thereafter. The fact, that they did not receive as much as the defendants, is no ground for invalidating the deeds to the latter. Inequality in the distribution of property is not of itself conclusive evidence of undue influence, although it may be considered as a circumstance tending to establish undue influence. The grantor or testator may give one child

more than another without invalidating the conveyance or will. (*Salisbury* v. *Aldrich*, 118 Ill. 199; *Schneider* v. *Manning*, 121 id. 376; *Burt* v. *Quisenberry*, *supra; Pooler* v. *Cristman*, *supra.*)

Nearly all the testimony introduced by the complainants in this case, for the purpose of showing the exercise of undue influence, consists of proof of declarations made by Solomon Wilkinson after his execution of the deeds herein attacked. Those declarations were to the effect, *first*, that he had been over persuaded by his sons, *second*, that he put the title out of himself, in order to keep the property from being lost through suits brought against him on account of his signing notes for his son-in-law, Cox. But it is well settled, that the declarations of a grantor, when the grantee is not present, cannot be admitted for the purpose of invalidating the deed. Parties, making deeds or wills, cannot invalidate them by their own parol declarations made previously or subsequently. (*Dickie* v. *Carter*, 42 Ill. 376; *Bennett* v. *Stout*, 98 id. 47; *Bentley* v. *O'Bryan*, 111 id. 53; *Guild* v. *Hull*, 127 id. 523; *Burt* v. *Quisenberry*, *supra*).

There was also some evidence of declarations made by one or more of the sons of Solomon Wilkinson to the effect that he made the conveyances to them, in order to keep the property from being swept away by the debts incurred as security for Cox. If such declarations made by the father and sons were properly admissible, the fraud upon creditors, which they tended to show, could in no way operate to the benefit of these complainants, who sue as heirs of the fraudulent grantor. The general rule is, that voluntary conveyances, although void as to creditors, are valid as to the parties, and cannot be set aside by the grantor, or his heirs. (1 Story's Eq. Jur. sec. 371; *Miller* v. *Markle*, 21 Ill. 152; *Harmon* v. *Harmon*, 63 id. 512; *Rawson* v. *Fox*, 65 id. 200; *Campbell* v. *Whitson*, 68 id. 240; *McElroy* v. *Hiner*, 133 id. 156).

The decree of the Circuit Court is affirmed.

*Decree affirmed.*