## William F. Nicewander *et al.*

### *v.*

### Alice Nicewander *et al.*

*Filed at Springfield, June 14, 1894.*

1. Wills—*contest of—undue influence—evidence of.* Where the evidence fails to show that a testator, at the time of making his will, was subject to any such undue influence, either from the effects of sickness

or from the pressure of improper persuasion, as deprived him of his free agency and rendered his act the offspring of another's will, rather than the product of the exercise of his own free will, his will will not be set aside on the ground of undue influence. It is true, that the mind, when enfeebled by disease and long sickness, may become susceptible to influence; but influence secured through affection is not wrongful, and inequality in the distribution of property is not of itself conclusive evidence of undue influence.

2. It has been held, that apparent inequality or unreasonableness in a testamentary disposition of property, though not of itself conclusive evidence of unsoundness of mind, or of undue influence, may be considered as a mere circumstance, tending to show such unsoundness or undue influence in connection with all the other facts and circumstances proven in the case.

3. Where a testator is shown to be of sound mind and memory, and free from the control of undue influence, it makes no difference whether his disposition of his property is just or unjust, for the reason that the law is, that any person competent to make a will may dispose of his property in such manner, not inconsistent with the law, as he chooses. He is under no legal obligation to divide it equally among his children, but may cut off one or all, and devise it to a stranger.

4. On the trial of a contested will, the court instructed the jury, "that if they find from the evidence that the deceased, in making the will in question, was influenced by affection, or attachment, or a disposition to gratify the wishes of 'his wife,' or by her advice or entreaty, that would not be sufficient cause for setting the will aside;" * * and "that testamentary capacity exists when the testator has an understanding of the nature of the business he is engaged in, and the kind and value of the property devised, and of the persons who were the natural objects of his bounty, and of the manner in which he desires it to be distributed, unless affected by some insane delusion": *Held*, that the last clause might well have been omitted, but its insertion would not authorize a reversal.

5. SAME—*insane delusion defined, and its effect.* Insane delusion consists in the belief of facts which no rational person would believe. In order that a testator may comprehend the relation which he holds to those having claims upon him, no insane delusion should influence his will; no disorder of the mind should poison his affections, pervert his sense of right, or pervert the exercise of his natural faculties.

6. Unreasonable prejudices against relatives is not ordinarily a ground for invalidating a will; but a will may be set aside when the testator's aversion is the result of an insane delusion, and his conduct can not be explained on any other ground.

151   156
201   5199
201   6199

151   156
212   5603

7.   SAME—*contest of—certified copy of will as evidence.*   On the contest of a will the proponents gave in evidence a copy of the will and its probate; the contestants sought to impeach the same on the ground of want of testamentary capacity and undue influence, and on the trial they had the original will in their hands, so that it could not be found in its proper place; it was held that, under these circumstances, the introduction in evidence of a certified copy of the will by the proponents was not error.   In such case, if there was any point in favor of the contestants that could have been made by viewing the original will, they should have produced it.

WRIT OF ERROR to the Circuit Court of Champaign County; the Hon. E. P. VAIL, Judge, presiding.

Mr. J. L. RAY, for the plaintiffs in error.

Mr. E. L. SWEET and Mr. J. S. WOLFE, for the defendants in error.

Mr. JUSTICE MAGRUDER delivered the opinion of the Court:

This is a bill filed on February 16, 1891, in the Circuit Court of Champaign county, by William F. Nicewander and Sarah J. Lutz against Alice Nicewander and her five minor children to set aside the will of Daniel Nicewander, who died on December 16, 1890, and whose will was executed on November 18, 1890.   The complainants are the children of the testator by a former wife, and the defendants are his widow, who was a second wife, and the children of such second wife.   The widow is the executrix, or administratrix with the will annexed.   The will was admitted to probate on December 27, 1890.   By its terms the testator gave to each of the complainants $600; directed that his wife should have what was allowed her by law, and gave all the rest of his property, real and personal, to be equally divided between his five minor children.   The bill charges, that the testator was not of sound mind and memory at the time of the execution of the will, and that he was induced to make his will by undue influence exercised over him by his wife, the said defendant Alice Nicewander.

The widow answered the bill, denying the charges, and a guardian *ad litem* was appointed and answered for the five minor defendants. The cause was tried before a jury, who returned a verdict finding the instrument, purporting to be the last will and testament of the deceased, to be such last will and testament. Motion for new trial was overruled, and decree was entered, dismissing the bill for want of equity, and for costs against the complainants.

There is the usual conflict in the testimony upon the questions of the soundness of the testator's mind and memory, and of the exercise over him of undue influence; but we think that the verdict of the jury is sustained by the evidence. For some time before his death, the deceased was afflicted with Bright's disease, and at times suffered great pain therefrom, having what the witnesses call "sick spells." But of the subscribing witnesses to the will, who were his neighbors and to whom he had previously spoken about being present, one of them swears that, when the testator signed the will, he was competent to do business and understood what he was doing; and the other swears that the will was read over to the testator, and that he was able to make it, and knew what he was doing, and requested witness to be executor and guardian of his children, and explained that he would make a difference in the amounts given to his children, proposing to leave most of his property, which did not altogether amount to more than $30,000.00, to his minor children, as they were small and had to be educated, while his two older children were "raised and educated, and doing in life." The attorney, who was sent for to draw his will, says, that he found him "half sitting, half reclining on a lounge," but that he dictated the manner in which he wished to dispose of his property, and the witness drew the will from such dictation; that the only matter he hesitated about was as to the person who should be his executor; that he asked Mr. Anderson, one of the sub-

scribing witnesses who was present, to act as executor, but he declined; that, thereupon, witness suggested the appointment of his wife as executor without bond; that he adopted the suggestion, but refused to waive the bond; that no person dictated the terms of the will, the testator alone directing it; that witness had known testator for several years; that "he was perfectly sane at the time he made his will"; and that it was "dictated * * by himself wholly uninfluenced at that time by any person." A witness, who had seen him almost every day during the last three months of his life, and sat up with him every other night during the two weeks before his death, says that "he was about the same as any man—as good as he ever was," except while the "sick spells" referred to lasted. He was seen riding out in a buggy with his wife after he made his will, and a week or two before he died. The keeper of a meat market swore, that he did business with him about ten days before he died, and saw nothing wrong about his mental capacity. Several witnesses who had known him well, speak of having business with him after he made his will, and say that they noticed no change in the condition of his mind. There is testimony, consisting largely of the evidence of the near relations of the complainants, which is of an opposite import from the proof introduced to sustain the will, but not of sufficient strength to overcome it.

There is no evidence of undue influence by the wife over her husband, which would justify us in setting aside the verdict. The wife was with the husband much of the time during his last illness, but not more than proper affection would dictate. She did nothing to produce alienation between him and his older children. He was on good terms with them, and called them by the familiar pet names, by which he was in the habit of addressing them, up to the time of his death. The wife received no more by the will than the law would have given her without the will. It is true, that the mind;

when enfeebled by disease and long sickness, may become susceptible to influence. (*Reynolds* v. *Adams*, 90 Ill. 134.) But we discover nothing in the facts of this case to justify the inference, that the testator, when he made his will, was subject to any such undue influence, either from the effects of sickness or from the pressure of improper persuasion, as deprived him of his free agency, and rendered his act the offspring of his wife's will, rather than the product of the exercise of his own will. (*Francis* v. *Wilkinson*, 147 Ill. 370.) He may have been influenced by affection, to give the five children of his old age, the oldest of whom was only about twelve years old, $5,000 or $6,000 apiece for their education, while he gave the two grown children only $600 apiece; but influence secured through affection is not wrongful, and inequality in the distribution of property is not of itself conclusive evidence of undue influence. (*Francis* v. *Wilkinson, supra.*)

Upon the trial, the proponents of the will introduced a certified copy thereof, instead of the original will itself. We held, in *Purdy* v. *Hall*, 134 Ill. 298, that, in trials of this kind, "either the original writing should be produced, or good cause shown for not producing it;" but we said in that case, that we did not "wish to be understood as holding that such introduction would in all cases be reversible error." We do not regard the failure to produce the original will as reversible error in the case at bar. When the certified copy of the will was offered in evidence by proponents, the original will, according to the admission now made by counsel for plaintiffs in error, was in the possession of the contestants, and not in the "office of the clerk of the county court," where the eighteenth section of the Statute of Wills requires it to remain. There is nothing in this record to show, that the proponents knew where the original will was, or that they had not looked for it in the office of the clerk of the county court and failed to find it there.

11—151 Ill.

There was no charge in the bill that the will was a forgery, or had been changed since it had been signed, or that there was any special circumstance which made the production of the original of the utmost importance. (*Purdy* v. *Hall, supra.*) On the contrary, the bill sets out the will *in hæc verba*, with the signature of the decedent and the attesting clause and. the signatures of the subscribing witnesses, and alleges, that the testator executed the instrument so set out, but charges that he was of unsound mind and memory, and under undue influence, when he did so. If there was any point in favor of the contestants that could have been made by viewing the original will, the contestants, who had it in their possession, should have themselves produced it; but they did not do so, or offer to do so. The objection made to the certified copy, that "the will itself should be introduced, because it is right here in the court house," was interpreted as referring to the office of the clerk of the county court, whence the original will had been taken, and where it could not be found, and not as referring to the possession of the will there and then by the contestants. Under these circumstances, the only thing, which the proponents could do, was to produce the certified copy, which is made "evidence in any court of law or equity in this State," under section 18 of the Statute of Wills. (2 Starr & Cur. Ann. Stat., page 2475.)

It is claimed, that the fourth instruction withdrew entirely from the consideration of the jury the question, whether the disposition made of his property by the testator in his will was just or unjust. We do not think, that such is the effect or meaning of the instruction, when considered as a whole, and when taken in connection with other instructions which were given on both sides. It has been held, that apparent inequality or unreasonableness in a testamentary disposition of property, though not of itself conclusive evidence of unsoundness of mind or of undue influence, may be considered as a mere circumstance, tend-

ing to show such unsoundness or undue influence, in connection with all the other facts and circumstances proven in the case. (*Salisbury* v. *Aldrich*, 118 Ill. 199; *Schneider* v. *Manning*, 121 id. 376.) This idea is clearly embodied in the first instruction given for the proponents, and in the sixth instruction given for the contestants. The latter instruction said to the jury: "You have a right to consider the fact, if it be a fact, that said testator discriminated against a part of his children in the distribution of his property, together with all the other facts and circumstances in the case," etc. The real meaning of the fourth instruction complained of is simply that, where the testator is shown to be of sound mind and memory, and free from the control of undue influence, it makes no difference whether his disposition of his property is just or unjust. In this sense, the instruction is not erroneous, because the law is, that any person competent to make a will may dispose of his property in such manner, not inconsistent with the law of the land, as he chooses. He is under no legal obligation to divide it equally among his children, but may cut off one or all, and devise it to a stranger. (*Schneider* v. *Manning, supra.*)

It is further claimed by plaintiffs in error, that the court erred in giving the third instruction given for the proponents, which is as follows:

"The court instructs the jury, that, if they find from the evidence, that the deceased, in making the will in question, was influenced by affection, or attachment, or a disposition to gratify the wishes of the defendant, Alice Nicewander, or by her advice or entreaty, that would not be sufficient cause for setting aside the will. The court instructs the jury, that testamentary capacity exists where the testator has an understanding of the nature of the business he is engaged in, and the kind and value of the property devised, and of the persons who were the natural objects of his

bounty, and of the manner in which he desires it to be distributed, unless affected by some insane delusion.''

This instruction seems to be warranted by the language used in *Schneider* v. *Manning, supra.* The definition given of testamentary capacity corresponds with that to be found in the authorities. (11 Am. and Eng. Enc. of Law, page 151, and cases in note 2.) The last clause, ''unless affected by some insane delusion,'' might well have been omitted in this case; but its insertion does not authorize a reversal. It has been said, that cases may exist where a person may be able to transact some business, and yet be incapable of making a will on account of an insane delusion. Insane delusion consists in the belief of facts, which no rational person would have believed. (*Schneider* v. *Manning, supra.*) In order that the testator may comprehend the relations which he holds to those having claims upon him, no insane delusion should influence his will; no disorder of the mind should poison his affections, pervert his sense of right, or prevent the exercise of his natural faculties. (*Banks* v. *Goodfellow*, L. R. 5, Q. B. 549.) Unreasonable prejudice against relatives is not ordinarily a ground for invalidating a will; but a will may be set aside where the testator's aversion is the result of an insane delusion, and his conduct can not be explained on any other ground. (11 Am. and Eng. Enc. of Law, page 154, and cases cited in note.) Here, the testator exhibited no such aversion towards his two oldest children as amounted to an insane delusion, though there was testimony tending to show that he did not regard it as his duty to give them as much as he gave to his minor children. Counsel say that ''insane'' was too strong a word, and that, by its use, the contestants were required to furnish a higher degree of proof than would have been required by the use of the words, ''unsound mind,'' or ''unsoundness of mind and memory.'' We hardly think that such an effect could have been produced upon the minds of

the jury by the use of the last clause of the instruction. "Insane" is composed of two Latin words—in, *not*, and sanus, *sound;* it means "unsound." There is very little difference between an insane man, and a man of unsoundness of mind and memory. One of the definitions, which Webster gives of "insane," is: "exhibiting unsoundness of mind."

The decree of the Circuit Court is affirmed.

*Decree affirmed.*