[Civ. No. 15219.  First Dist., Div. Two.  Apr. 30, 1953.]

AUGUSTA DE LAGUNA SPAULDING, Appellant, v. HARRY LOVELL JONES, Individually and as Executor, etc., et al., Respondents.

542

John M. Hoffmann, Howard C. Erickson, Robert V. Winkler and Hoffmann & Erickson for Appellant.

H. Raymond Hall for Respondents.

GOODELL, J.—The plaintiff sought an adjudication that a piece of real property was subject to a trust. The court held against her contentions and from a judgment for the defendants she appeals.

The property, on 24th Street near Telegraph Avenue in Oakland, has an area of 65 by 135 feet and is improved with a two-story dwelling numbered 532 24th Street, referred to in the pleadings and briefs (and herein) as "532." The building is very old.

On January 3, 1905, it was owned by Alexander de Leo de Laguna who on that day conveyed it by gift deed to his oldest daughter Anita, reserving a life estate in himself. On May 5, 1909, she conveyed it by gift deed to her sister Laura de Laguna, in whose name it stood until November 30, 1931, when Laura put the title into joint tenancy in her own name and that of her close friend Kate Bardenwerper. Laura died on September 24, 1948, and a proceeding was brought terminating the joint tenancy. After appellant had asserted her claim that about 1905 the property had become impressed with a trust and had so remained throughout the intervening transfers of title, Kate, on April 25, 1949, conveyed "532" to respondent Jones, in whose name it now stands.

Alexander de Leo de Laguna died testate on March 4, 1905, two months after his deed to Anita, and his estate was probated and distributed. In addition to Anita and Laura he left three daughters, Fredericka, Bertha and Augusta, a son

named Theodore, and another son named William, who was appellant's father. All seven children died before this suit was brought.

The case was tried on plaintiff's second amended complaint and before submission leave was granted to file a third amended complaint to conform to the proof. In their answers defendants pleaded the statute of limitations (Code Civ. Proc., section 338, subdivision 4) and laches, and the court found for the defense on both pleas.

The action was brought by appellant on behalf of others similarly situated but no other relatives aligned themselves with her.

Appellant's contentions appear from the allegations of her third amended complaint, which may be summarized as follows: de Laguna owned other property and prior to his death he and all his children entered into an oral agreement for the purpose of settling *at the time* the rights of inheritance of each child in *all* his property, and to achieve an economical and equitable distribution of *all* thereof; that in furtherance of said agreement *all* his property was transferred to Anita, to be held in trust for the benefit of his children and the issue of deceased children; that at his death all his property except "532" was to be divided and distributed among the children and the issue of deceased children; that "532" was to be held in trust by Anita until it was sold, at which time the proceeds were to be divided equally among the children and other descendants of de Laguna; that Anita stood in a confidential relationship to all the participants in the agreement; that "532" was conveyed to Anita without consideration other than her promise to hold it in trust, and was conveyed to her in reliance on such promise.

It was alleged, further, that upon the death of de Laguna in 1905 the agreement to distribute the property was carried out, and Anita retained title to "532" and occupied it until her death in 1910; that on May 5, 1909, she conveyed it to Laura, who was one of the participants in and beneficiaries of the agreement, and that her deed to Laura was made with the consent of the other children and in continuance of the trust agreement. It was alleged that the property was not sold on Anita's death because a fair price was not obtainable; that Laura continued to occupy the premises as trustee but that on November 30, 1931, without the knowledge of the beneficiaries Laura created the joint tenancy as already stated.

Laura left a will by which "532" was left to Kate, her

surviving joint tenant, in disregard (so it is alleged) of the oral trust agreement; the will was admitted to probate on the petition of respondent Jones, its executor; that under the will and the joint tenancy deed Kate will obtain complete title to ''532'' unless the court declares a trust for the benefit of de Laguna's descendants.

It was also alleged that since filing the original complaint plaintiff discovered that Kate had conveyed ''532'' to respondent Jones; that he took with knowledge of the trust; that no consideration was paid; that the conveyance was made to defraud plaintiffs of their interests; that plaintiffs were unaware, until the death of Laura, of any breach of fiduciary duty, because of the confidential relationship and because Laura continued in uninterrupted possession until her death.

The court found that by the father's transfer to Anita no trust had been imposed upon her to hold the property for the benefit of anybody; that she made no promise to hold it in trust, and that her father in conveying to her did not rely on any promise to so hold it. It found that there was no agreement between de Laguna and his children that Anita would hold ''532'' in trust for them or anybody else, and that no such agreement was performed or carried out; further, that de Laguna's will was admitted to probate and his estate disposed of in accordance with the decree of distribution and not pursuant to any testamentary agreement. It found that the deed of May 5, 1909, from Anita to Laura was made without any promise by Laura to hold the property in trust, and that Anita did not rely on any promise made by Laura to deal with the property in any way, but that the conveyance was absolute and in fee simple and not made in furtherance of any trust or other agreement. And, finally, it found that there were no limitations in any of the deeds conveying the property (a) to Anita, or (b) from her to Laura, or (c) from Laura to Harriet Price, or (d) from Harriet to Laura and Kate as joint tenants.

Appellant contends that the findings just summarized are not supported by the evidence, but are contrary thereto. She does not challenge the finding that there was no ''written memorandum establishing any trust or agreement to deal with the property in any particular manner'' since there is no contention that there was any writing.

The real problem in the case is whether a trust arose out of the original transfer of January 3, 1905; every other question is subordinate to that.

The transfer from de Laguna to Anita was made by a deed absolute on its face, and the authorities are uniform to the point that to justify a court in determining from oral testimony that a deed which purports to convey land absolutely in fee simple was intended to be something different, as a mortgage or trust, such testimony must be clear and convincing—*"something more than that modicum of evidence which appellate courts sometimes hold sufficient to warrant a finding where the matter is not so serious as the overthrow of a clearly expressed deed, solemnly executed and delivered."* (*Sheehan* v. *Sullivan,* 126 Cal. 189, 193 [58 P. 543] ; emphasis added.) The language just emphasized was repeated in *Wehle* v. *Price,* 202 Cal. 394, 397 [260 P. 878]. The opinion in the Sheehan case, which deals with a trust question, summarizes the various forceful expressions which the courts have used "in declaring how strong such evidence must be" to overthrow a deed. It cites also a New York case which speaks of "The security of titles and sound public policy" as among the reasons for the rule.

To these cases might be added *Emery* v. *Lowe,* 140 Cal. 379 where, at page 384 [73 P. 981], the court said: "A judgment decreeing a deed which is on its face an absolute and unconditional conveyance of property to be something else should be based on clear and satisfactory proof (*Sheehan* v. *Sullivan,* 126 Cal. [189] 196 [58 P. 543], and cases there cited), and an appeal from such a judgment sometimes presents a difficult question; but where, as in the case at bar, *a trial court has declared such an instrument to be just what it purports to be, an appellant from such a judgment cannot expect a reversal unless the evidence is almost overwhelmingly the other way . . .* " (Emphasis added.)

Recent restatements of the rule are found in *Beeler* v. *American Trust Co.,* 24 Cal.2d 1, 7 [147 P.2d 583], and *Hobart* v. *Hobart Estate Co.,* 26 Cal.2d 412, 446 [159 P.2d 958]. In the Beeler case the court says that "whether or not the evidence offered to change the ostensible character of the instrument is clear and convincing is a question for the trial court to decide," citing cases.

Appellant was the only witness who testified respecting conversations out of which a trust might have arisen. From 1894 when she was 4, until 1922 when she married, she lived with her parents at 528 24th Street a door or two away from "532." The earliest conversation she could remember took

place, she testified, "Some time before, I would say 1904 or '3. Very early, because this was a continuous conversation about this property. Q. Now, can you recall any one particularly, a specific conversation between Anita and Laura and/or your grandfather? Do you recall your grandfather's conversation? A. Oh, yes, very well . . . " It "was either in my home or my grandfather's home, which was next door, . . . the conversations were held, all of them, either in my home or my grandfather's home when the family was present." When asked who were present on such an occasion, she replied "My grandfather was present part of the time, and my Aunt Anita was always present, as I remember, and my father was present . . . Some of them were there with one or the other of the children, depending on which was home at that time. . . . There were many conversations. Q. And at this late date is it possible for you to give the exact conversation which took place at such a time and place? A. Oh, no, I couldn't give any exact words. . . . Q. Now . . . will you give us your best recollection of what was actually stated at the first of such conversations, and particularly in regard to the real property, the subject of this action? A. Well, of course I can't distinguish the conversations, as I said, because we lived almost next door—they ran from day to day, so there was a series of conversations. My grandfather . . . said to this effect: that he wished to occupy the property and continue enjoying the rents, as he always had done, and . . . that upon his death the property which he had was to be divided among his children equally and including the daughter of Ottila, who was alive, the mother having previously died. He said that he would convey the property to Anita to hold it for the children so that there would be no loss of the property by any forced sale, and so that it could be disposed of when it was the right time to sell it. . . . Q. Now, was Anita present at that conversation? A. She was present at a conversation when that was said . . . " and she added so was Laura.

The foregoing summarizes the only testimony there was with respect to discussions claimed to have been held prior to de Laguna's death.

Appellant then testified that Anita "wasn't tremendously robust, but she managed the house. She was, of course, unemployed. She was not very well. She went around on a tricycle, for instance, which shows you she didn't walk very much." She was then asked whether, *after the grandfather's death*, she recalled "any conversation between your Aunt

Anita de Laguna and your Aunt Laura de Laguna and/or others who were interested, in regard to the disposition of this property? A. Yes. . . . Q. Do you know whether or not your Aunt Anita de Laguna disposed of any property which she received from your grandfather, in accordance with the terms of the conversations of which you have testified to, and distributed the proceeds of that property to any of those entitled to it? A. Yes. . . . Q. . . . Now then, at the death of Anita de Laguna had the property . . . No. 532 - 24th Street been sold, and the proceeds distributed? A. No.'' She testified to a conversation respecting ''532'' between Anita and Laura, at which her father and mother were present ''and probably some others, but I can't remember.'' When asked who were living in ''532'' she answered: ''Aunt Anita was living in the upstairs apartment, which was also occupied by other members of the family who lived out of town, when they came into town . . . The whole family used the top floor of it. Q. Now, do you recall how long prior to the death of Anita was it that this conversation took place with Laura? A. I couldn't say except that it was before December 1909, because my father died in December 1909. Q. . . . Will you tell us in your best recollection what was said by all of the parties at that conversation? A. The discussion was relative to what ought to be done with 532, its sale or disposition, and who should take the title to the property, because my Aunt Anita was failing in health. . . . Q. Now . . . will you tell us what was said by Laura, what was said by your father or any other person who was a party to this conversation? A. There wasn't only one conversation, you know. My Aunt Anita said that if it was agreeable to the others, she would transfer the title of 532 to Aunt Laura and let her hold it for the family interest. My father who was present, and the other relatives who came frequently home and . . . who knew of this arrangement, assented to it. Q. Just tell us what was said at this particular conversation . . . what did Laura say in response to the statement of your Aunt Anita? A. Well, she said that she would hold the property and not sell it until a good price could be had for the property. Q. Now . . . I think you have testified that there were numerous conversations. Now then, from time to time, and prior to the time of the death of your Aunt Anita, were all of the then living brothers and sisters of Anita and Laura, did they engage in the same or similar conversations with Anita and Laura, as they would come to town? . . . A. Before her death, yes. I

would say they weren't all together at any one time. Q. At various times when they would come to town there would be conversations, is that correct? A. Yes, that is correct.''

The foregoing is the sum and substance of all the testimony there is with respect to the conversations out of which this trust is claimed to have arisen or continued and the findings indicate that the court was not convinced by it.

Appellant argues that it was uncontradicted and therefore had to be accepted as conclusive, but as long ago as 1860 the Supreme Court held that ''A court may reject the most positive testimony, though the witness be not discredited by direct testimony impeaching him or contradicting his statements.'' (*Blankman* v. *Vallejo*, 15 Cal. 638, 645.)

In *Lohman* v. *Lohman*, 29 Cal.2d 144, 149 [173 P.2d 657] the court said: ''Moreover, a trial judge is not required to accept as true the sworn testimony of a witness, even in the absence of evidence directly contradicting it . . . '' citing *Berg* v. *Journeymen's P. & G. F. Union*, 5 Cal.App.2d 582, 584 [42 P.2d 1091]. In that case this court said: ''The general rule that uncontradicted testimony cannot be disregarded by the trial court is subject to many qualifications and exceptions. The rule has no application unless the testimony is sufficiently positive in its character to be satisfactory from that standpoint, and even though the evidence is both positive and uncontradicted, it may be disregarded under certain circumstances. [Citations.] As was said in *Hufstetler* v. *Department of Industrial Relations*, 107 Cal.App. 741, at page 746 [290 P. 922], quoting from 10 California Jurisprudence, page 1145: 'As it is within the province of the trial court to determine what credit and weight shall be given to the testimony, *the appellate court cannot control a finding or conclusion denying credence, unless it appears that there are no matters or circumstances which at all impair the accuracy of the testimony.*' '' (Emphasis added.) The language just emphasized is found in *Blanc* v. *Connor*, 167 Cal. 719, 723 [141 P. 217].

There are in this case many facts and circumstances which could have been taken by the trial court as creating a conflict or as inconsistent with appellant's testimony, or as impairing its accuracy.

First and foremost are the several deeds themselves, each of which is absolute on its face and as to which the court expressly found that there were no limitations whatever. Under the rule of *Emery* v. *Lowe, supra,* in the face of such a finding there can be no reversal ''unless the evidence is al-

most overwhelmingly the other way.'' In *Olson* v. *Olson,* 4 Cal.2d 434, 438 [49 P.2d 827], it was said: ''The deed of gift, a written instrument, signed and acknowledged by appellant, and unimpaired by any presumption of undue influence arising out of a marital relation between the parties, was entitled to the full credit given to it by the trial court, and standing alone furnishes sufficient support for the findings of the trial court upon which the judgment with reference to the real property was predicated.''

The trial court undoubtedly treated the weight of appellant's testimony to be seriously impaired by the fact that in all the years from the early 1900's to Laura's death none of the children or grandchildren had made any attack on the several transfers or asserted that any trust had been created either before or after de Laguna's death. Moreover, appellant brought this suit on behalf of all others similarly situated, and the fact that none of her relatives saw fit to join her was doubtless considered by the court in evaluating her testimony (compare *Sheehan* v. *Sullivan,* 126 Cal. 189, 190, *supra*).

The finding that de Laguna's estate was not disposed of pursuant to any testamentary agreement shows that appellant's testimony had been effectively contradicted by the probate record and the deeds from the sisters and brothers to Anita.

That finding is based upon the decree of distribution and several deeds. The will, dated August 8, 1892, was not offered in evidence, but the following part thereof was read into the record:

''I give, devise and bequeath to my beloved daughters Anita and Bertha, the house and grounds, 65 by 135, known as the home cottage, with all of the furniture except my library, which I bequeath to my son Theodore, book cases included. To my beloved daughters Frederica, Laura and Gussie, I give and bequeath each an undivided interest in the two houses east of the home cottage and grounds 86-foot frontage and having a depth of 135 feet, and the remainder 100 feet deep.''

The decree recites that the devisees and legatees were Frederica, Laura, Augusta, Bertha, William, Theodore, and Herman, children, and Mary Ruth Hutchinson (presumably a grandchild). Anita is not shown therein as a devisee or legatee. She was, however, the executrix. The decree recites that all the devisees and legatees, except Herman who predeceased the testator, had conveyed to Anita all their right, title and interest in the property of the estate. These conveyances are in evi-

dence and all were recorded at the same time, and before distribution.

The decree distributes the residue of the estate in the following language: "The whole thereof to said Anita de Laguna, *absolutely in fee*" (emphasis added) and then describes the parcel next door to "532" and the Kelsey property across the street, but makes no mention of "532," doubtless because the testator had already conveyed it to Anita.

These conveyances were the basis for the decree vesting in Anita the residue of the estate (consisting of the two parcels not involved herein) which decree, it should be observed, uses the language *"absolutely in fee."* This documentary evidence was apparently taken by the court as establishing that the estate was not distributed "pursuant to any testamentary agreement" and that no trust had been created prior to the testator's death. If, as appellant claims, all these children had been parties to any trust agreement respecting *all* the de Laguna property either before or after their father's death they presumably would not have made these deeds to Anita. There would be no conceivable reason to do so since, but for their deeds to Anita the property would have been distributed to them share and share alike. It was just such a distribution that the alleged trust was supposed to have contemplated and effected.

While it is true that "Inconsistencies only affect the credibility of the witness or reduce the weight of his testimony . . ." (*Stromerson* v. *Averill*, 22 Cal.2d 808, 814-815 [141 P.2d 732], citing 10 Cal.Jur. p. 1146, § 364), still there are within appellant's own evidence and pleadings discrepancies, inconsistencies and contradictions which the trial court presumably considered in evaluating her testimony.

All four verified complaints alleged that *prior to de Laguna's death he and all his children* "entered into an oral agreement for the purpose of settling the rights of inheritance of each of the children . . . in and to all" his property, and appellant testified that the conversations were in 1903 or 1904. On cross-examination, however, she was confronted with a letter which she wrote to respondent Jones and his wife (a niece of Kate) on October 4, 1948, ten days after Laura's death, reading in part as follows: "I hope that Aunt Laura's will—whatever it may be—may not bring the bitterness attendant upon Aunt Dica's passing. You perhaps know that '532' stands upon a somewhat different basis than any other property 'owned' by Aunt Laura. In 1905, *on Grandpa's*

*death,* an agreement *among his heirs* resulted in the home house (532) going to Aunt Anita with the understanding that when it was sold—which was to be on Aunt Anita's death— the property would be divided among the heirs. The purpose of this was to afford Aunt Anita the house for her life. It was one-half rented and brought in a small but steady income. Aunt Anita died, and by her will the title to the property passed to Aunt Laura, but the duty to share the proceeds when sold went with the title. One of the reasons Aunt Laura hung onto the house and did not sell was that she did not want to divide the proceeds. Aunt Gussie was very bitter about it and I talked both to her and to Aunt Bertha and to Aunt Dieka about it. No one wanted to force a sale but it seemed unfair for her to keep it by refusing to sell it.'' (Emphasis added.)

There is a wide discrepancy arising, on the one hand, from appellant's allegations and testimony that the trust was created by the owner of the trust *res,* himself, and, on the other, from her statement in the letter, *written a year before this litigation was commenced,* that the trust arose out of an agreement among de Laguna's heirs *after his death* which meant, of course, that it was *not* created by the owner of the trust *res* at all. The discrepancies are not only as to the *time* of the creation of the trust, but as to the *manner* of its creation, and the *person or persons* who created it.

There are other discrepancies arising from appellant's testimony or written statements and documentary evidence in the record. One is the statement in the letter that ''In 1905, on Grandpa's death, an agreement among his heirs resulted in the home house (532) going to Aunt Anita.'' This is contradicted by the gift deed to Anita from her father made on January 3, 1905, two months before his death.

The letter says ''532'' had gone to Anita ''with the understanding that when it was sold—which was to be on Aunt Anita's death—the property would be divided among the heirs'' and the original, amended and second amended complaints so alleged. ''The purpose of this,'' says the letter, ''was to afford Aunt Anita the house for her life.'' The third amended complaint, however, departs from all three earlier complaints, and from the letter as well, by alleging ''that 532, by virtue of said agreement, was to be *held in trust* by Anita F. de Laguna *until said property was sold,* at which time the proceeds of said sale [were] to be divided equally.'' (Emphasis added.)

The letter says "Aunt Anita died, and by her will the title to the property passed to Aunt Laura . . ." This is inconsistent with the third amended complaint which alleges that title passed from Anita to Laura by gift deed dated May 5, 1909, recorded on October 10, 1909, some months before Anita's death, which deed is in evidence.

Finally, it must be borne in mind that at the time of the conversations in 1903-1904 by which, under appellant's theory, a trust was created, and the participants in these conversations were talking about "life interests" in real property and the avoidance of "forced sales" and such technical matters, the witness was a child of but 13 or 14 years.

Appellant contends that the strict rule (discussed earlier) with respect to attempts to overthrow deeds absolute on their face does not apply in cases where a conveyance is made between parties occupying a confidential relation. *Katz* v. *Enos,* 68 Cal.App.2d 266, 277 [156 P.2d 461] is cited, where it was said "that the presumption and burden of proof rule contended for by appellants does not apply where a confidential relationship is shown to exist between the parties at the time of the execution of the deed." The court went on to say (p. 278) : "Here the court found that such relationship did exist, and it would seem that the evidence is sufficient to support such finding." *In the case at bar there was no such finding and could have been none* since there was no evidence that confidential relations existed between de Laguna and Anita (father and daughter) or between Anita and Laura ( sisters) within the meaning of the law. In *Knapp* v. *Knapp,* 15 Cal.2d 237, 242 [100 P.2d 759] it was said : "although family connection alone is not sufficient to support a finding of a confidential relationship, it may be considered with other evidence upon that issue (*Johnson* v. *Clark,* 7 Cal.2d 529 [61 P.2d 767] ; *Odell* v. *Moss,* 137 Cal. 542 [70 P. 547].)" In the Knapp case the parties were brothers; in *Johnson* v. *Clark, supra,* they were sisters; in *Odell* v. *Moss, supra,* they were brother and sister. ▮ In *Smith* v. *Mason,* 122 Cal. 426, 427 [55 P. 143] the court said: "It is not alleged that Daniel Hoover was in any respect incompetent to execute the deed to defendant, nor that he at all mistook its contents, nor that defendant procured it by means of undue influence or fraudulent promises, or, indeed, that she made any effort whatever to obtain it. The fact that the instrument was made from father to daughter, and the alleged fact that it was without consideration, do not in and of themselves raise a presumption

of fraud nor suffice to raise a resulting trust in favor of other children of the grantor. (*Tillaux* v. *Tillaux*, 115 Cal. 663 [47 P. 691]; *Emmons* v. *Barton*, 109 Cal. [662] 671 [42 P. 303]; *Soberanes* v. *Soberanes*, 97 Cal. 140 [31 P. 910, 17 L.R.A. 301]; *Francis* v. *Wilkinson*, 147 Ill. 370 [35 N.E. 150]; Perry on Trusts, sec. 201; Civ. Code, sec. 1040.) The judgment should be affirmed.'' The foregoing language, paraphrased, is directly applicable here. *Soberanes* v. *Soberanes*, 97 Cal. 140 *supra*, involved a deed from a mother to her adult son; *Soberanes* v. *Soberanes*, 106 Cal. 1 [39 P. 527], likewise. In *Nessen* v. *Nessen*, 218 Cal. 59, 61 [21 P.2d 415], the court said: ''The relationship of parent and child alone, without a showing of a practically exclusive opportunity designedly created for the purpose of influencing the grantor in favor of one to the exclusion of several children, and no claim is advanced that such a showing was made, can hardly be said to cast a burden upon the grantee to dispel every suspicion thrown in his direction by his brothers and sisters. [Citations.]'' See, also, *Estate of Ricks*, 160 Cal. 450, 461 [117 P. 532] cited approvingly in *Estate of De Soberanes*, 182 Cal. 525, 528 [189 P. 103].

The case of *Sheehan* v. *Sullivan*, 126 Cal. 189, *supra*, has many points of similarity to this case. That case involved a conveyance from a husband to his wife, as to which a daughter sought unsuccessfully to have a trust declared. The court points out that there was no attempt to prove undue influence as a fact. There was no such attempt made herein. Despite the fact that the conveyance was from husband to wife the court still applied the strict rule (see 126 Cal. 193-194) and did not hold that the rule was any different because of a husband-wife relationship or that the burden shifted. We repeat that in *Katz* v. *Enos*, *supra*, the court found a confidential relation to exist (supported by an extremely aggravated set of facts) while here there was no evidence whatever of such relationship.

The original complaint makes the broad and sweeping allegation that Anita ''was one of the children of said grandfather, and was a blood relative of all of the participants of said agreement, and stood in a confidential relationship to all the participants to said agreement.'' It then alleges that there was no consideration for the first conveyance from de Laguna to Anita.

As far as the father was concerned, there is no evidence in this case even tending to show that his deed of January 3,

1905, to Anita was procured by her by the exertion of any pressure or undue influence. She was the oldest daughter but there is nothing in the record to show that she had ever attended to any of her father's business affairs, had advised or counseled him in any way, occupied any "superior position," or had handled any transactions or in any other way conducted herself so as to occupy a confidential relationship as that expression is used in the cases and understood in the law. Moreover, it nowhere appears that the father was incompetent or of weak mentality, or at all subject to influence. Anita, on the other hand, was in poor physical condition and, it could be easily inferred, needed protection and security.

Appellant attacks the findings that her claim is barred by laches and the statute of limitations. There is no reason to discuss this subject, for if the evidence is sufficient to support the finding on the principal issue as to whether a trust arose—and we are satisfied the court correctly found that it was sufficient—there is no necessity to go further.

It is the rule that "if a judgment is amply supported by findings which are unobjectionable, findings on other issues become immaterial, and it is not ground for reversal that such other findings are unsupported by the evidence or are uncertain or are otherwise defective. However unsupported or inconclusive any number of findings may be, if in any case there be at least one clear, sustained and sufficient finding upon which the judgment may rest, every presumption being in favor of the judgment it will be concluded on appeal that the Court rested its judgment upon that finding (or such findings) and the others will be disregarded." (2 Cal. Jur. pp. 1028-1029 quoted in *Porter* v. *Miller*, 201 Cal. 750, 754 [258 P. 595].)

The legal title to "532" is now vested in respondent Jones, the husband of a niece of Kate Bardenwerper. The latter conveyed it to respondent on April 25, 1949, after the appellant had raised the questions now in litigation, following the death of her Aunt Laura. Miss Bardenwerper conveyed the property under a declaration of trust, which respondent Jones accepted, which provided in part, that he was "To ascertain and determine the moral or legal right, if any, of the de Laguna family, or any of the heirs of Laura de Laguna to all or any portion of the trust property. In making such determination the Trustee is to examine the Last Will and Testament of Laura de Laguna, any instructions that said Laura de Laguna may have made, any and all documents that were

in the possession of said Laura de Laguna, to talk with any or all members of the de Laguna family or any of the heirs of Laura de Laguna that the Trustee may determine may be helpful in ascertaining any moral or legal claim of that said family . . . ''

It goes without saying that the present appeal is concerned only with the question whether a trust arose in the early 1900's, and if so, whether it continued through the several transfers of title into the joint tenancy of Laura and Kate, and thence into Kate's sole ownership. The trial court determined that no trust ever arose, hence that no trust relation could have continued, and, as already appears, we are satisfied that that judgment must be affirmed.

We mention the present Bardenwerper-Jones trust relation simply because it is in the case, as a piece of evidence. It has no evidentiary force in this litigation. It is of interest as showing that Miss Bardenwerper was willing to leave it to others to determine whether ''532'' should go back to the de Laguna family *all things considered, including moral claims and moral rights.* This litigation is concerned only with such claims and rights as are within the cognizance of the courts.

The judgment appealed from is affirmed.

Nourse, P. J., and Dooling, J., concurred.