180 Cal.App.2d 313 (1960)
Estate of FANNY LAUTH, Deceased. THE CHICAGO HISTORICAL SOCIETY, INC. (a Nonprofit Corporation) et al., Respondents,
v.
SAM M. LAW et al., Appellants.
Civ. No. 24161. 
California Court of Appeals. Second Dist., Div. One. 
Apr. 26, 1960.
 Hill, Farrer & Burrill and William S. Scully for Appellants.
 Wright, Wright, Goldwater & Wright and Dudley K. Wright for Respondents.
 FOURT, J.
 This is an appeal from a judgment entered on the special verdict of a jury, setting aside the probate of the decedent's purported last will and testament on two grounds; namely (1) incompetency and (2) undue influence. The contest was filed after the purported will had been admitted to probate.
 The jury found affirmatively on each of the two issues, namely (1) that decedent lacked the requisite mental capacity at the time of executing her will on August 13, 1952, and (2) that undue influence was exerted by Sam Law who was both the executor and also one of the major beneficiaries.
 The contestants are corporate charities of Illinois, and Dean Ernest Holmes, of the Church of Religious Science. Contestants (charities) were named as the principal beneficiaries in decedent's prior (1945) will. The earlier will was executed by decedent on June 30, 1945, and a codicil thereto was executed on August 2, 1945.
 Dean Ernest Holmes was named both as a contestant and as a respondent.
 Appellants are the proponents of the will dated August 13, 1952, which was nullified on both grounds by the jury's verdict. The proponents-appellants are: Sam M. Law, the named executor and one of the beneficiaries; Olivette C. Law, wife of Sam M. Law and first cousin of decedent; Bessie A. McClenahan, sister of Olivette C. Law and first cousin of decedent. Olivette and Bessie are decedent's sole heirs at law.
 The other respondents named in the contest after probate below are: Sophie Reusser; Edward N. Peck, Alice Berwin, Betty Reynolds, Dean Holmes (also a contestant); Glenn Gissler and Ruth Gissler defaulted and did not join Sam M. Law and his wife, Olivette C. Law, and her sister, Bessie A. McClenahan, in supporting the 1952 will, or in resisting the contest after probate filed thereto by the Illinois charities and by Dean Ernest Holmes.
 At the conclusion of contestants' case, a motion for nonsuit *317 was made, and denied by the trial court. A motion for a directed verdict was also made and denied. Finally, motions for a judgment non obstante veredicto, and for a new trial were made and denied by the court.
 The contest having occurred after the will was admitted to probate, it was established prima facie that the will was duly executed by a testatrix who was competent and free from undue influence. [1] The burden of proof rested upon the contestants to establish invalidity. (Estate of Baird, 176 Cal. 381, 384 [168 P. 561].) [2] Testamentary capacity is presumed to exist until the contrary is established. The ultimate question becomes what actually was the testatrix' mental state at the moment of the testamentary act. (Estate of Goddard, 164 Cal.App.2d 152, 157 [330 P.2d 399]; Estate of Russell, 80 Cal.App.2d 711, 714-715 [182 P.2d 318].)
 Appellant's first contention is that there was no evidence to support the jury's conclusion that the decedent was mentally incompetent to make the will of August 13, 1952. Estate of Bristol, 23 Cal.2d 221 [143 P.2d 689] sets forth the judicial limitations where the question on appeal is the sufficiency of the evidence to support the findings of the jury. [3] It is stated at page 223:
 "The rules of evidence, the weight to be accorded to the evidence, and the province of a reviewing court, are the same in a will contest as in any other civil case. (Estate of Snowball (1910), 157 Cal. 301, 305 [107 P. 598]; Estate of Barr (1924), 69 Cal.App.16, 33 [230 P. 181].) [4] The rule as to our province is: 'In reviewing the evidence ... all conflicts must be resolved in favor of the respondent, and all legitimate and reasonable inferences indulged in to uphold the verdict if possible. [5] It is an elementary ... principle of law, that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. ...' " (Emphasis added.)
 Our function then is to ascertain whether there is any substantial evidence in the record which supports the verdict. Portions of the record are set forth in the footnote hereto. [fn. 1]
 [6a] A reading of the entire record convinces us that there is substantial evidence to support the contention and verdict that decedent lacked the requisite mental capacity to *318 execute a will at the time she did so, on August 13, 1952. [7] "The trier of fact is the sole judge of the credibility and weight of the evidence in a will contest the same as in any other case." (Estate of Teel, 25 Cal.2d 520, 526 [154 P.2d 384].) [8] This court examines the evidence but does not weigh it. [9] As said in Estate of Teel at page 527: "All of the evidence most favorable to the respondent must be accepted as true, and that unfavorable discarded as not having sufficient verity to be accepted by the trier of fact. If the evidence so viewed is sufficient as a matter of law, the judgment must be affirmed." (See also Estate of Moore, 143 Cal.App.2d 64, 67 [300 P.2d 110]; Estate of Bould, 135 Cal.App.2d 260, 263-264 [287 P.2d 8, 289 P.2d 15].)
 There was a conflict in the evidence in this case and the trier of fact upon substantial evidence resolved that conflict against the proponents of the August 13, 1952, will. When that determination was so made it should be binding upon this court unless the evidence against such determination is such that reasonable minds could come to no other but a contrary conclusion.
 [10] It was said in Estate of Fosselman, 48 Cal.2d 179 at 185, 186 [308 P.2d 336]:
 "Testamentary incompetency on a given day, however, may be proved by evidence of incompetency at times prior to and after the day in question. (Citations.) [11] Once it is shown that testamentary incompetency exists and that it is caused by a mental disorder of a general and continuous nature, the inference is reasonable (citations), perhaps there is even a legal presumption (citations) that the incompetency continues to exist. Such an inference is particularly strong in a case such as this in which the decedent was suffering from senile dementia, a mental disorder that becomes progressively worse. (Citations.) 'Senile dementia begins gradually, is progressive in character and in its advanced stages "the brain is well-nigh stripped of its functions." The difficulty lies in determining the point at which in its progress it has so impaired the faculties that they fall below the mark of legal capacity. ...' "
 [6b] We cannot say that as a matter of law the inferences drawn in this case were unreasonable nor can we say that the determination made by the jury was unreasonable.
 Appellants' second contention is that the testatrix was not subjected to any undue influence and that her last will, executed on August 13, 1952, was her free, voluntary and uncontrolled testamentary act. *319
 Appellants have correctly pointed out that if the jury's verdict can be sustained on either of the issues submitted to it, the judgment below must be affirmed. [12] A pertinent statement is made in Estate of Wolf, 174 Cal.App.2d 144, 150 [344 P.2d 37] as follows:
 "There being one clear sustained and sufficient finding upon which the judgment may rest, the sufficiency of the evidence to sustain other findings becomes immaterial. (Logan v. Forster, 114 Cal.App.2d 587, 602 [250 P.2d 730]; Spaulding v. Jones, 117 Cal.App.2d 541, 554 [256 P.2d 637].) Hence, we need not consider the finding that the will was the product of undue influence."
 [13] We have determined that there was substantial evidence to sustain the contention that the testatrix lacked the requisite mental capacity to make a will on August 13, 1952, and therefore it will not be necessary to consider the contention that the will was the product of undue influence.
 [14a] The next asserted error is that the trial court erred in respect to the admission of Exhibit 12 (i.e., a letter from Sam Law to a Mr. Colwell dated August 12, 1951). Mr. Colwell had been an officer with the Northern Trust Company of Illinois, and he had handled many of decedent's business affairs.
 The letter provides in part:
 "Knowing you personally as we do and knowing that you too have a personal interest in Mrs. Lauth I am going to trust you to keep the contents of this letter Secret. It is not for the Bank and I do not want it on record. Please. I want it to be strictly between you and me and off the record."
 "* * *"
 "Mrs. Law and I love Fanny dearly and we have tried to help Fanny in every way we can. Mrs. Law and her sister are Mrs. Lauth's nearest and perhaps her only blood relations. The fact remains that she is a free agent and does still make all her own decisions."
 "I could go on and on but knowing her and her situation as you do I am sure you have the picture in mind. There are however a few points on which you can advise me better than anyone else."
 "1.--What about Dr. Fifield with his aggressive (sic) ideas and his apparent objectives? I believe he meant what he said. How far would he or can he go?"
 "2.--Did we do right in handling the apartment situation? *320 Is the rental rate too high? She has been there a week and not only loves it but is actually proud of it."
 "3.--* * *"
 "4.--Edward Peck is a likable fellow and in many ways has been good to Fanny. He told me himself that he is taking over the management of Fanny and her affairs. I asked to see his credentials and he said he did not have them yet. He said he had consulted a lawyer and is trying to get Fanny to sign a Power of Attorney authorizing him to sign checks against her account."
 "5.--The Reynolds I do not trust and for good reason. They hate me thoroughly because I will not accept their brand of religion. Possibly I have stood in their way a few times."
 "6.--As I see it too many people with no authority are pulling at Fanny trying to advise her. She gets all confused. When it gets too bad she comes to us and so far we have been able to set her straight again thru persuasion."
 "7.--No doubt she has already made provision for the final disposition of her estate. Has she also appointed or otherwise provided for someone to look after her when she can no longer carry on for herself? If she becomes ill who would be expected to step in and take care of her? Fanny is failing in many ways. (Last italicized portion deleted when the letter read to jury.) Normally our duty would be clear but where others are involved, as they no doubt are, we would feel pretty silly to carry for them the responsibilities that are definitely coming up. Then when its all over discover that others will get all the final benefits. I do not like to talk of these things but facts cannot be ignored in any discussion of the issue."
 "I have been quit (sic) frank with you. May I again ask you to please treat this letter as a personal confidence between you and me. Please destroy this letter when you have read it."
 "* * *"
 Outside the presence of the jury there was a discussion by the court and respective counsel as to the admissibility of the aforementioned letter. [fn. 2]
 The jurors were then called into the jury box and the letter (i.e., Exhibit 12) with the exception of "Fanny is failing in many ways" was read to them by Mr. Wright.
 The letter as admitted into evidence (i.e., "Fanny is failing in many ways" being deleted therefrom) did not go to the "Testamentary incapacity" aspect of the case, but was directed *321 to the matter of "undue influence." [15] It is well settled in this state that the admission of one of several legatees, against the validity of the will, is incompetent. (Estate of Dolbeer, 149 Cal. 227, 245-246 [88 P. 695, 9 Ann.Cas. 795]; Estate of Dolbeer, 153 Cal. 652, 662 [96 P. 266, 15 Ann.Cas. 207]; Estate of Purcell, 164 Cal. 300, 311 [128 P. 932].) As stated in Estate of Purcell, at page 311:
 "That the court correctly excluded testimony of a statement claimed to have been made by Charles A. Purcell, the residuary legatee, to the effect that 'he wrote the will and Valentine put it in legal form,' is settled ... The excluded statement was no more than an admission tending in some degree to prove undue influence. ..."
 [14b] Respondents argue in an effort to justify the admission into evidence of the letter, the theory of "state of mind" of Sam Law or "motive." Respondents state in their brief:
 "The truth of the matter is, however, that Exhibit 12 has a great deal of meaning in that it is direct evidence of Sam Law's motive which by itself would not be sufficient to establish undue influence but certainly is material and taken with other evidence may constitute a part of the evidence as a whole supporting undue influence." (Emphasis added.)
 However, even assuming that the admission into evidence of the letter did constitute error in some minor degree, it is not under the circumstances of this case prejudicial error and is not sufficient to require a reversal of the judgment. The letter only went to "undue influence" and there still remains an independent basis (i.e., "testamentary incapacity") upon which the judgment is sustained.
 [16] Subsequently, during the trial, the portion of the letter previously deleted (i.e., "Fanny is failing in many ways") came in, not as evidence of the proof of the statements therein made, but for the purposes of impeachment. [fn. 3]
 An examination of the transcript belies appellants' contention that "The jury was therefore told very clearly, that Exhibit 12 was to be considered by them for each, all and every purpose, including impeachment purposes, and without any restriction whatever."
 The "Dolbeer" rule does not prevent the use of statements made by a legatee for purposes of impeachment. (Estate of DelLaveaga, 165 Cal. 607, 632 [132 P. 307].) *322
 Appellants' fourth contention goes to alleged errors in the giving and refusing to give certain jury instructions. The issue of undue influence not being necessary to the determination of the case, only those instructions given or refused with reference to the issue of testamentary incapacity will be dealt with.
 Appellants' proposed instruction based upon Estate of Lingenfelter, 38 Cal.2d 571, 581 [241 P.2d 990], which the trial court refused to give was in fact covered by other instructions which the court did give.
 [17] Appellants submitted an instruction which reads as follows:
 "Mere proof of mental derangement or even of insanity in a medical sense is not sufficient to invalidate a will. The contestants are required to go further and prove either a complete mental degeneration as denotes utter incapacity to know and understand those things which the law prescribes as essential to the making of a will, and which I have already mentioned, or the existence of a specific hallucination or insane delusion which affected the making of the will in question."
 The first sentence of said instruction was given. The second sentence thereof was not given for the reason that the matters referred to in the second sentence were fully covered elsewhere in the instructions which were given.
 [18] Appellants also complain of the court's refusal to give the instruction which reads as follows:
 "The petition for appointment of guardian of Fanny Saylor Lauth, case Number 346371, was admitted in this case for strictly a limited purpose, namely, for impeachment, and was not admitted as proof of the statements therein contained."
 "You are instructed that there is no evidence in this case that the Testatrix was committed, as a mentally ill person, to Garden Grove Sanitarium or any other place."
 During the cross-examination of Mrs. Law, the record discloses that portions of the petition were used for impeachment of Mrs. Law, namely:
 "Q. Well, did you think she was of sound or of unsound mind in 1953? A. Well, I thought she was of sound mind."
 "Q. You thought she was of sound mind? A. Yes."
 "Q. You didn't think she was incompetent in 1953? A. No."
 "* * * *323 "
 "Q. I show you a document, Mrs. Law, entitled 'Petition for Appointment of Guardian of Incompetent Person' and ask you if that is your signature on that paper? A. Yes, sir; that is my signature."
 "Q. May I ask whether you read that document before you signed it? Did you? A. Yes."
 "Q. You refer to Aunt Fanny in here as an incompetent person, don't you?"
 "Mr. Sease: Object to that. Read the document."
 "* * *"
 "The Court: Read the document and ask her if she didn't say that."
 "Q. Read the petition if you will, Mrs. Law."
 "* * *"
 "Q. I will ask you, Mrs. Law, if it isn't true that on the________ in October of 1953 you signed a Petition for the Appointment of a Guardian of Incompetent Person, reading as follows:"
 " 'To the Superior Court of the State of California, in and for the County of Los Angeles.'"
 "Mr. Sease: I will_______ this is not in evidence."
 "The Court: What?"
 "Mr. Sease: This is not in evidence__________ that he is going to read to the witness."
 "The Court: It is for impeachment purposes. She testified she was competent throughout 1953. (Emphasis added.)"
 "Mr. Sease: I see."
 "Q. 'Petitioner, Olivette C. Law, respectfully shows:"
 " '1. That she is a relative of the above named incompetent person, to wit, a cousin of said incompetent person; that Fanny Saylor Lauth was, on October 16, 1953, declared a mentally ill person by the above entitled court, in Department 54 thereof, and that the Court directed that she be confined in a private sanitarium, known as the Garden Grove Sanitarium, without expense to the State of California; that said Fanny Saylor Lauth is now confined in said sanitarium.'"
 "Paragraph 4 of said petition reads:"
 " 'That the only relatives within the second degree of said Fanny Saylor Lauth residing in the State of California are as follows: ... That said Fanny Saylor Lauth has no guardian legally appointed by law or otherwise. That she is not qualified to take care of herself and manage her property, and that it is necessary that a guardian of her estate and person be appointed.' *324 "
 "Q. Did you sign that signature? A. Yes, sir."
 "* * *"
 "The Court: Paragraph 5 says that she is unable to take care of herself and manage her property. So I will overrule the objection."
 It cannot be said as a matter of law that the failure to give the instruction in question constituted reversible error.
 As indicated by the transcript, the trial judge made it quite clear that the petition was being used for impeachment purposes. An instruction on impeachment was given. Also, an instruction was given as to the effect of an adjudication of a testator's incompetency made in testator's lifetime in a proceeding for the appointment of a guardian. There was received into evidence (Exhibit 5) the "Order Appointing Guardian of Incompetent" in case Number 346371.
 [19] Appellants next assert that an instruction which was given and is set forth below was not sufficiently clear to justify the court's refusal to give one of appellants' requested instructions. The instruction as given provides:
 "An adjudication of a testator's incompetency made in testator's lifetime in a proceeding for the appointment of a guardian of his or her person and estate is not conclusive upon the issue of competency to make a will, but is a factor to be considered on the issue of want of testamentary capacity at the time of adjudication, and may be considered on the issue of capacity at the time the will was made."
 Appellants' requested instruction provided:
 "You are instructed that the fact that the Testatrix, Fanny S. Lauth, was adjudged an incompetent in a guardianship proceeding, on November _______, 1953, and at a date fifteen (15) months after her will was executed, is only evidence of her mental condition on the date of such adjudication. Said adjudication does not establish, nor is there a presumption, that Fanny S. Lauth was incompetent or lacking testamentary capacity on the date her purported will was actually executed. Evidence as to mental condition after the execution of the will is important only insofar as it may tend to show mental condition at the very time such will was executed, namely, August 13, 1952."
 It is difficult to see how appellants can seriously contend that the instruction as given was not sufficiently clear and expressive of the established law.
 Appellants' other contentions with reference to instructions are without merit. *325
 Appellants' assertion that the trial court erred when it denied: (1) appellants' motion for nonsuit; (2) motion for judgment notwithstanding the verdict; (3) motion for a directed verdict; and (4) motion for new trial, are answered by this court's determination that there was substantial evidence in the record to support the verdict of testamentary incapacity.
 Appellants' other contentions have been examined and nothing appears therein which would justify this court in reversing the judgment of the trial court. For the reasons stated, the judgment is affirmed.
 Wood, P. J., and Lillie, J., concurred.
 Dr. Thompson specializes in the field of psychiatry and neurology. He graduated from the School of Medicine, University of Southern California in 1938, served an internship at the U.S. Naval Hospital in San Diego, then had a series of residence trainings in a number of hospitals and clinics which included the Veterans Psychiatric Hospital in Washington, D.C., the St. Elizabeth's Hospital, the Municipal Hospital in Washington, D.C. and the Childrens Hospital also at the Neuro-Psychiatric Clinic, Johns-Hopkins University Hospital in Baltimore; thereafter in the Massachusetts Hospital in Boston. Following that he was at the Los Angeles County General Hospital where he was chief psychiatrist for 4 and 1/2 years. He is a member of several hospital staffs and is certified by the American Board of Psychiatry and Neurology in both fields. He is also a teacher at two Veterans Hospitals and is an associate clinical professor in psychiatry at the School of Medicine, University of Southern California. He has published four books in the field of psychiatry and has published 50 articles in scientific journals in the field. He is a member of several medical associations including being a Fellow of the American Psychiatric Association and is secretary of International Research which is concerned with the study of biological psychiatry. In October of 1953 he was a consultant in psychiatry to the Criminal Division of the Superior Court in Los Angeles County and did examine Fanny Saylor Lauth in connection with a proceeding before the Psychiatric Department of the Superior Court.
 Dr. Thompson testified in part as follows:
 Direct Examination:
 "Q. On October 16, 1953, did you have occasion to examine Fanny Saylor Lauth, in connection with the thing that was before the Psychopathic Department of our Superior Court? A. Yes, sir; I did."
 "Q. And did you make a tentative diagnosis of Fanny Saylor Lauth's mental health at that time? A. I did."
 "Q. What was that diagnosis, Doctor? A. That she suffered with chronic brain syndrome with senile mental deterioration."
 "Q. Doctor, would you explain to us what chronic brain syndrome means? A. Well, the term 'chronic brain syndrome' means a chronic condition of the brain, and it can be due to a number of causes. The essence of it is that it is a chronic kind of condition in anybody's brain; a disease process."
 "Q. Doctor, based on your examination of October 16, 1953, did you at that time have an opinion as to whether she was of sound mind? A. Yes, sir; I did."
 "Q. What was that opinion? A. That she was not of sound mind."
 "Q. Doctor, based on your examination of October 16, 1953, of Fanny Saylor Lauth, did you have an opinion as to whether she at that time understood the nature of the act of executing a will? A. Yes, I did have an opinion."
 "Q. What was that opinion, Doctor? A. That she was completely incompetent to understand anything about a will at that time, or to execute one."
 "Q. Doctor, based upon your examination of October 16, 1953, of Fanny Saylor Lauth, did you have an opinion as to her mental capacity on that date to understand the nature or extent of her property?"
 "Mr. Sease: To which I object on the ground that nature and extent is no test."
 "The Court: Overruled. A. Yes, I had an opinion."
 "Q. What was that opinion, Doctor? A. That she did not have the mental capacity to understand the nature and extent of her property."
 "Q. Doctor, based upon your examination of Fanny Saylor Lauth on the 16th day of October, 1953, did you have an opinion as to whether she had the mental capacity to know the natural objects of her bounty on that day? A. Yes, I had an opinion."
 "Q. What was that opinion, Doctor? A. That she didn't have the mental capacity to know the objects of her bounty."
 "Q. Now, Doctor, based upon your examination of Fanny Saylor Lauth on October 16, 1953, did you have any opinion as to how long she had had the mental condition that you diagnosed on that day?"
 "Mr. Sease: I will object to that as incompetent, immaterial, and irrelevant."
 "The Court: I think it is within the realm of an expert. He has qualified. How long she had it--how long she had had this lack of capacity which he testified to. Go ahead, Doctor. A. Well, I estimate about roughly four years. Possibly five years."
 "* * *"
 "The Court: You recall your question. The question was asked as to her mental capacity on the date of this examination. Then the question was asked as to whether he had an opinion as to whether her mental capacity or lack of mental capacity had existed for some period of time. Am I correct?"
 "Mr. Sease: He said three or four or five years."
 "The Court: Is that correct? Is that correct, Doctor? A. Yes, sir: I said four to five years."
 "The Court: Have I correctly stated your testimony, Doctor, to the extent that I have mentioned?"
 "The Witness: Yes, sir."
 "Q. Doctor, are you familiar with the term 'senile dementia'? A. Yes, sir; I am."
 "Q. Is that still in use? A. Well, it is used, but it has been replaced officially by the term I gave you, 'Chronic brain syndrome with senile mental deterioration.'"
 "Q. So that your diagnosis of Fanny Saylor Lauth on October 16, 1953, and for three, four, or five years prior thereto would be that she had senile dementia, if that term was still being used; is that about it? A. That is true, yes."
 "Mr. Wright: I have no further questions."
 Cross-examination:
 "Q. Well, how can you testify, sir, that this woman didn't have capacity to make a will when you have never read the terms of the will?"
 "* * *"
 "A. Well, yes. I testified in that manner because at the time of my examination of her, she certainly was incompetent to make a will, and projecting this back on the basis of information I had available and my knowledge of the course of the disease, and my examination of the patient, it was my opinion she couldn't have had such mental capacity from--this was a year and a half or two years before that--enough to make a will." (Emphasis added.)
 II.
 Some of the testimony of Ruth Gissler. (The father of the witness and Fanny Saylor Lauth were stepbrother and stepsister.):
 "Q. Now directing your attention to the month of August, 1952, did you see Aunt Fanny during that month? A. Yes, sir."
 "* * *"
 "Q. And did you have a conversation on your visits with Aunt Fanny, or the visits in August, 1952 with Miss Sophie Reusser? A. Yes, sir; I did."
 "Q. Now would you give us your best present recollection of your observations of Aunt Fanny during that period of time? Would you tell us about the conversation that you had with her, and would you tell us what you observed about her physical appearance and the way in which she walked, and so forth?"
 "The Court: Is that now referring to August, 1952? A. August, 1952."
 "* * *"
 "The Court: The question was, what did you observe about Aunt Fanny, Mrs. Gissler? What did you say to her and what did she say to you and so forth? A. Well, she had always been a very meticulous person and she was sloppy in her dress and her clothes were not clean. Even though buttons were on the dress, the dress was unbuttoned and she seemed not to care about it. And, her transformation was often crooked. She walked with a shuffling walk. She just ran on with no notion of direction whatever."
 "Q. About her conversations, Mrs. Gissler, did Aunt Fanny in August, 1952 carry on conversations with you naturally? A. No, usually it was a monologue."
 "* * *"
 "Q. Did you notice this monologue before? A. Yes, sir."
 "The Court: Ask her when. When did you first notice that Aunt Fanny spoke in what you described as a monologue? A. Approximately November or December, 1951."
 "* * *"
 "Q. When you stated that Aunt Fanny spoke in a monologue way, would you describe for us what you mean by that? Can you describe for us the record and if you recall when, I want you to fix about the time you had the conversation with her. A. In November or December, 1951. Well, it seems to me she would get something in her mind and that would be the extent of the discussion. I mean, we couldn't interject anything. For instance, if I would say, 'I am going with Helen,' Aunt Fanny would look at me kind of funny like, and even if I repeated it, she usually didn't get it and she would go on with what was in her mind. So, really we had no discussion."
 "* * *"
 "Q. Would you just answer this question yes or no: Did you at any time have any conversations in which Aunt Fanny mentioned communists to you? A. Yes, sir."
 "Q. Would you tell us when you had such conversations? A. In November and December and January--in the months of the winter of 1951 and 1952."
 "* * *"
 "Q. Would you tell us what was said by Aunt Fanny with reference to communists at the times and in the places that you have identified?"
 "Mr. Stough: (Objection.)"
 "* * *"
 "The Court: We are not trying any political subdivision or any political beliefs, but it is a question of law as to whether that is competent evidence as to her fears, her fear of communists and her like or dislike of them, and so forth, but whether it is to go to anything other than that, or to establish anything other than that, I don't know. ..."
 "A. She said, 'That man is crazy. They are out in the hall.' And she pointed under the door. 'They are coming under the door.' And she took us in the bedroom and indicated some boxes and said, 'They come from those boxes all the time I am cleaning up.' She had us in the bedroom and she said they were coming under the door, under the crack of the door; the communists were."
 "* * *"
 "Q. Mrs. Gissler, in August, 1952, how frequently had you, prior thereto, seen Aunt Fanny?"
 "* * *"
 "A. On the average of once a month."
 "Q. And did you have an opinion in August of 1952 whether or not Aunt Fanny was of sound or unsound mind? A. Yes, sir; I did."
 "Q. What was that opinion? A. That she was of unsound mind."
 "Q. Would you state your reasons for that opinion? A. Well, the fact that she wasn't apparently aware of what was going on around her, and the fact that she could be physically led. I have also ..."
 "* * *"
 "A. The fact that she couldn't carry on any conversation with anyone, and that she had these fears of communists (the remainder of the answer was stricken.)"
 "* * *"
 "Q. Before the date of August, 1952, what would Aunt Fanny call your husband when she would see him? A. Oh, anything dear."
 "Q. Do you remember anything else she called your husband? A. Phil on occasion, or Phillip."
 "* * *"
 "Q. What is your husband's name? A. Glen."
 "Q. Is Phil or Phillip in his name as a middle name or anything? A. No."
 "Mr. Stough: Object to that."
 "The Court: Well, she testified she didn't recognize people. Possibly it goes to that. Overruled."
 Cross-examination:
 "* * *"
 "Q. ... Do you recall the last time you took her out at all? A. Yes, sir."
 "Q. When was that? A. Probably October of 1951."
 "Q. And the reason you didn't take her out any more after October, 1951 was because it was beginning to be embarrassing to you when you would take her out; is that not correct? A. That's right."
 "* * *"
 "Q. Now in August, 1952, did she recognize you? A. Not by name."
 "Q. In August of 1952, could she have gone shopping and bought herself clothes? A. In my opinion, no."
 III.
 Direct examination of Ethel Wells. (The father of the witness was adopted by decedent's husband's family when the said father was 8 years old.)
 "* * *"
 "Q. When did you first know Aunt Fanny? A. I have known her all my life."
 "* * *"
 "Q. Did you ever talk to Aunt Fanny on the phone? A. Oh, many times."
 "Q. I direct your attention to the period of time from 1945 to 1947. Do you recall any instance when you had any conversations with Aunt Fanny about any men bothering her? Answer yes or no. A. Yes."
 "Q. Can you tell the Court any more exactly approximately the period of time this was; what year? A. It was in 1946 or 1947."
 "Q. Would you tell us your best recollection what was said by Aunt Fanny and what was said by you? A. She told me that a former partner named Bailey in Chicago was having her followed and trying to get her."
 "* * *"
 "A. Well, she claimed that people were on the roof looking at her."
 "Q. What did she say about men up on the roof watching her. Anything else that was said on that occasion? A. They were following her."
 "* * *"
 "Q. Mrs. Wells, did you have an opinion during that period of time that Aunt Fanny was still living at Chateau Elysee ..."
 "The Court: In what year?"
 "Q. In 1950. Prior to the time she moved from that establishment, as to whether Aunt Fanny was of sound or unsound mind?"
 "The Court: Did you have an opinion? A. Yes."
 "Q. Answer yes or no. A. Yes."
 "Q. What is that opinion? A. Unsound."
 "Q. Now give us your reasons for that opinion. A. Her actions; her appearance."
 "Q. Would you tell us what it was about her actions and what it was about her appearance that formed the reasons for this opinion? A. Well, she was a very fastidious person up until that time, and became rather sloppy in her dress and appearance. Makeup."
 "Q. Anything else? A. She seemed to be confused in her conversation. It was rambling."
 "* * *"
 "The Court: Gentlemen, I have read this letter, and I don't see what it proves on the issues in the case. Is it stipulated that we are out of sight and sound of the jury?"
 "* * *"
 "Mr. Sease: Improper under the Dolbier (sic) (i.e., Dolbeer) case."
 "The Court: Doesn't make any kind of a statement about Fanny. Doesn't make any representation or any statement as to Fanny."
 "Mr. Sease: Or any other statement that has a material bearing here at all."
 "The Court: He doesn't say that she is incompetent or anything, or that her mental condition is bad."
 "Mr. Sease: I haven't seen it. I don't see the materiality. Mr. Wright says he believes that the letter that Mr. Colwell wrote in April of 1952 was in response to that. That's what I guess he is talking about."
 "Mr. Sease: ... What are you offering it for?"
 "Mr. Wright: It is part of the correspondence."
 "Mr. Sease: ... I want to know what it relates to."
 "Mr. Wright: You read from that correspondence and when you offer that, I am entitled to get the rest of it in."
 "* * *"
 "The Court: Mr. Wright, obviously the document offered, ... unless I am doing something that violates the rules of evidence ... it must be something that goes to prove some issue in this case."
 "Mr. Wright: Your Honor, Mr. Law's state of mind is an issue in this case. This document goes to show his state of mind, and in addition to that, it is part of the conversation between Mr. Colwell and Mr. Law. Mr. Sease has chosen to introduce correspondence between Law and Colwell. This is the same as part of a conversation."
 "* * *"
 "The Court: Will you state what it proves or just why it should go in?"
 "Mr. Wright: Your Honor, aside from being the rest of the conversation that Mr. Sease put in by Exhibit A, it is for the purpose of proving the state of mind of Mr. Law, which is an important issue, but more as impeachment in connection with undue influence. In addition to that, it is part of the written conversation started by Mr. Sease and shows the state of mind of Mr. Law."
 "* * *"
 "The Court: ... It is your position that this letter is admissible simply because it is part of the correspondence?"
 "Mr. Wright: I ask, too, Your Honor, that you take a look down at paragraph 7 (set forth supra) of this letter, on the last page."
 "* * *"
 "This is the state of mind of Mr. Sam Law and I submit Mr. Sease opened it by putting his letter in."
 "* * *"
 "The Court: The objectionable thing to me in Paragraph 7 is the statement about Fanny failing in many ways."
 "* * *"
 "Mr. Wright: I am agreeing that that be stricken. ..."
 "Mr. Sease: I think under the evidence that the contents of the letter are immaterial to any issue. It is incompetent under the Dolbier (sic) decision, in a will contest. Simply because counsel wants to call this a declaration, or state of mind of the writer--if that is admitted, the Dolbier (sic) case would be done completely away with."
 "The Court: No, no. The Dolbier (sic) case does not mean that everything Mr. Sam Law does is incompetent. It doesn't say that."
 "* * *"
 "The Court: ... In my opinion the Dolbier (sic) case is limited to declarations and admissions under the theory that one beneficiary could not bind the others by saying she was completely mentally gone, and bind the other beneficiaries. That is the basis of it. That you can't do anything to harm their interest. But, this is his writing. He is the writer here."
 "Mr. Sease: The writer's state of mind?"
 "The Court: His own state of mind. Not as to his knowledge about Fanny's state of mind. ..."
 "* * *"
 "Mr. Sease: The point in the Dolbier (sic) case, then, you believe is this: If the declaration is by the person that is accused, or is alleged to have committed undue influence, then his declaration is admissible?"
 "The Court: As I said, it indicates a mosaic pattern, sort of, ... Now I think in respect to any matters that Mr. Law did, I think what he did would be something on which the jury might draw an inference."
 "Mr. Wright: That is the question, Your Honor."
 "The Court: It is his state of mind."
 "Mr. Sease: We have nothing established absolutely I don't know why that comes in."
 "The Court: We must assume it is established absolutely. Mr. Voorhees testified that Sam Law called him and sought him out to make the will. Took her to him and said why he brought her there. I am not determining here just what it may be worth. I said when this was first proposed by Mr. Wright, that as I viewed this question, he must necessarily proceed to prove or connect up the series with what I termed the mosaic pattern. They are desirous of tying it up. I don't know, maybe when they get through they may have tied it up."
 "* * *"
 "The Court: ... This letter says at Paragraph 7: 'Where others are involved, as they no doubt are, we would feel pretty silly to carry for them the responsibilities that are definitely coming up. Then when it's all over, discover that others will get all the final benefits.'"
 "Mr. Sease: How does that show state of mind so far as undue influence is concerned?"
 "The Court: Well, I am a 13th juror. I don't agree with Mr. Wright, frankly, in his statement. I do think if the state of mind of one of the Respondents would be part of the case, which the Court would have to consider on a separate basis, then he can put it in."
 "* * *"
 "Mr. Wright: I don't think we had marked it in evidence. At this time, I would like that that one letter of August 12, 1951 from Sam Law to Mr. Colwell be offered--be marked as Contestants' 12, and I offer it in evidence."
 "The Court: The letter described by Counsel may be received. However, the sentence in Paragraph 7 stating, 'Fanny is failing in many ways,' is stricken. ..."
 "Q. (By Mr. Wright): Mr. Law, in August of 1951 did you observe whether Fanny had any physical difficulty? A. 1951?"
 "Q. 1951, yes. A. Not that I recall."
 "* * *"
 "Mr. Wright: Your Honor, I am now about to go into Exhibit 12."
 "Q. Mr. Law, I show you Contestants' Exhibit 12 that is in evidence, and ask you to read to yourself that last page of that letter that is marked out in pencil. Don't read it out loud. A. I can read--all right. Then what else?"
 "Q. You may read all of the last page, but I am particularly interested in that part that is marked out in pencil. A. Yes."
 "Q. Have you read that to yourself? A. Yes, sir."
 "Mr. Wright: Your Honor, I now offer in evidence that portion of Exhibit 12 in evidence that was stricken out in pencil, for impeachment purposes. (Emphasis added.)"
 "* * *"
 "The Court: Anything else? Is it just impeachment that it is being offered for?"
 "Mr. Sease: Just for impeachment?"
 "Mr. Wright: That is the offer. ..."
 "* * *"
 "Mr. Sease: Wait a minute. Are you offering it for any other purpose?"
 "The Court: Just for impeachment."
 "* * *"
 "The Court: We have in the record, then, have we not, that that sentence is only in for impeachment purposes?"
 "Mr. Wright: For impeachment purposes."
 "The Court: The sentence appearing in Paragraph 7 of Plaintiffs' Exhibit 12 is received in evidence--that sentence--for the purpose of impeachment only. That sentence reads: 'Fanny is failing in many ways.'"
 "We therefore have Exhibit 12 in evidence for all purposes except for that particular sentence, and I assume that the entire letter is in for the purpose also of impeachment, including that sentence. It is an odd situation." (Emphasis added.)
 Cross-examination (Continued):
 "By Mr. Wright:"
 "Q. Mr. Law, do you wish to explain the statement in this letter of August 12, 1951 that Fanny was failing in many ways? A. I think I covered that. I was putting it in a natural way. That she was an elderly person and many elderly persons do fail with age, Your Honor. That is my Answer."
NOTES
[fn. 1] 1. I. Dr. George N. Thompson, qualified as an expert witness for the contestants.
[fn. 2] 2. The transcript sets forth in part:
[fn. 3] 3. During the cross-examination of Mr. Law, the record discloses in pertinent part: